417 So.2d 788 (1982)
STATE of Florida, Appellant,
v.
Jessie James JONES, Gregory Stubbs, Joseph Chester and Damon Richardson, Appellees.
No. 81-661.
District Court of Appeal of Florida, Fifth District.
August 4, 1982.
*789 Jim Smith, Atty. Gen., Tallahassee, and James Dickson Crock, Asst. Atty. Gen., Daytona Beach, for appellant.
Anthony Paul Mario, Jr., of Mario & Green, Cocoa, for appellees.
PER CURIAM.
At approximately 10:30 P.M. on Saturday night, January 24, 1981, a BOLO report was issued concerning an armed robbery of Mann's Jiffy Food Store, a convenience food store on South A1A in Melbourne Beach, Florida. The BOLO stated that two blacks on foot had robbed the store and gave a general description of the men and their clothing. Three Indialantic policemen heard the report and concluded that there were only two reasonable ways of leaving the beachside community: one of the ways was five miles from the site of the robbery, the other was twenty miles. The officers also presumed that the suspects needed a car in order to successfully flee the island community. The police headed for a key intersection located near the closest route for any robbers to leave the island community.
At that point, the police saw a car containing four blacks pass by that intersection. The intersection was two to three miles away from the scene of the robbery and the car was spotted approximately two to three minutes after the BOLO report. The defendant's car was headed north away from the Jiffy Market. The car made a sharp left turn, in which no signal was used, with the wheels screeching. The vehicle was travelling approximately five to ten miles per hour above the speed limit, and its speed fluctuated throughout the ensuing chase, occasionally dipping below the speed limit.
The officers followed the car in an unmarked police car, staying approximately two to three car lengths behind. After seeing the driver of the car suspiciously look frequently in his rearview mirror, and observing three of the passengers drop down out of sight, the police stopped the vehicle. The officers testified that they knew there was only one black family living in the island community, and that the occupants of the car were not members of that family. They also testified that it was very unusual to see any blacks in the community on a weekend night. The only blacks normally seen in the community were there only in the daytime on construction jobs. When the officers stopped the car, they saw a sawed-off shotgun on the floor of the vehicle, and discovered money taken from the Jiffy store in a brown bag. Shortly thereafter, the victim of the robbery at the Jiffy store was brought to the scene and made a positive identification of two of the defendants as the men who had robbed her some half hour before.
At a subsequent hearing on a motion to suppress all tangible evidence obtained as a result of the stop, defense counsel argued that there were insufficient facts to constitute a founded suspicion that the appellees had committed the robbery and argued that they had been stopped merely as a result of the officers' "hunch" and because of the fact that they were black. Based upon this argument, the trial court granted appellees' motion to suppress and the state has timely filed this appeal.
We believe that the dispositive case in regard to this appeal is the recent United States Supreme Court case of United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). In the majority opinion in Cortez, Chief Justice Burger wrote:
The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle here. Reid v. Georgia, 448 U.S. 438, 442, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980); United States v. Brignoni-Ponce, 422 U.S., supra, at 878, 95 S.Ct., at 2578; Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); Terry v. Ohio, 392 U.S. 1, 16-19, 88 S.Ct. 1868, 1877-1879, 20 L.Ed.2d 889 (1968). An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. Brown v. Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, *790 61 L.Ed.2d 541 (1979); Delaware v. Prouse, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979); United States v. Brignoni-Ponce, supra, 422 U.S., at 884, 95 S.Ct., at 2581; Adams v. Williams, 407 U.S. 143, 146-149, 92 S.Ct. 1921, 1923-1924, 32 L.Ed.2d 612 (1972); Terry v. Ohio, supra, 392 U.S., at 16-19, 88 S.Ct. at 1877-1879.
Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances  the whole picture  must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. See, e.g., Brown v. Texas, supra, 443 U.S., at 51, 99 S.Ct., at 2640; United States v. Brignoni-Ponce, supra, 422 U.S., at 884, 95 S.Ct., at 2581.
The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment mus be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions  inferences and deductions that might well elude an untrained person.
The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same  and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.
The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in Terry v. Ohio, supra, said, "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." Id., 392 U.S., at 21, n. 18, 88 S.Ct., at 1880, n. 18 (emphasis added). See also, Brown v. Texas, supra, at 661-663, 99 S.Ct. at 1400-1401; United States v. Brignoni-Ponce, 422 U.S., at 884, 95 S.Ct. at 2581. (Emphasis added.)
101 S.Ct. at 694-95. In our view, the police in the instant situation formulated common sense conclusions, based upon the whole picture and a reasonable suspicion that the occupants of the automobile stopped had engaged in wrongdoing. Based upon that whole picture, the detaining officers had a particularized and objective basis for suspecting these particular persons of criminal activity, and the trial court was in error in granting the motion to suppress. Accordingly, that ruling is reversed and this case remanded for trial.
REVERSED and REMANDED.
DAUKSCH, C.J., and COBB, J., concur.
COWART, J., concurs specially with opinion.
COWART, Judge, concurring specially:
This case involves the sufficiency of the circumstances to constitute reasonable grounds (probable cause) to believe, or to create a reasonable or founded suspicion, that appellees had committed a crime, justifying municipal police officers pursuing appellees outside their geographic jurisdiction, stopping their vehicle and detaining them.
*791 The night store clerk at Mann's Jiffy Food Store, a convenience food store on south A1A in Melbourne Beach, Florida, was robbed at gunpoint at about 10:30 p.m. on a Saturday night by two black males who fled on foot. The clerk immediately called the police, who announced that fact over the police radio, requesting officers to be on the lookout for the robbers.
Sergeant Philip B. Williams, a police officer in the City of Indialantic, heard the BOLO and, observing an Oldsmobile carrying four black occupants, followed it out of Indialantic across Indian River and into the City of Melbourne, where he eventually pulled the vehicle over. The occupants (appellees) were required to exit, and a sawed-off firearm and the stolen money were found in the vehicle. Appellees were arrested and the store clerk was brought to the scene of the arrest. She identified two of the appellees as the robbers. At a subsequent hearing on motion to suppress all tangible evidence obtained as the result of the stop, defense counsel argued that there were insufficient facts to constitute a founded suspicion that appellees had committed the robbery and that they were stopped merely as a result of the officer's "hunch" and because they were black. The trial court granted appellees' motion to suppress and the State filed this appeal.
Both the state and federal constitutions protect private citizens from unreasonable searches and seizures.[1] Detentions, including brief investigatory stops of vehicles, are seizures of a person for fourth amendment purposes.[2] The purpose of the constitutional proscription is to impose a standard of "reasonableness" upon the discretion of law enforcement and other governmental officials to safeguard the privacy and security of individuals against arbitrary invasion.[3] There must be reasonable grounds to believe that the person has committed a crime in order for an investigatory stop of such person not to be an arbitrary invasion of that person's constitutional rights.[4] The police officer's level of suspicion need not rise to the level of probable cause; a "founded suspicion" or "reasonable suspicion" is sufficient. All factors should be taken into account; this includes police reports, modes and patterns of criminal activity and all reasonable inferences and deductions made by trained police officers.[5] Additional factors such as the implications of time, day of the week, location, physical *792 appearances, behavior and activity, are also to be considered.[6]
Before considering the facts and circumstances in this case in more detail, a consideration of the broad picture and of the nature of the problem here and a definition of some concepts and terms may be helpful.
Pure legal questions normally arise in an argument in which a rule of law is the major premise and the facts of the particular case are the minor premises; a conclusion is urged and reached by an analysis of the validity of the resulting syllogistic type of deductive argument. In legal arguments there are usually differences of opinion as to the applicable rule of law or as to the true facts in the particular case or as to the soundness and propriety of the application of the correct rule of law to the true facts. However, whatever the dispute as to content, because of their form, it is an unquestioned principle of logic that in all legal and other such deductive arguments the truth and correctness of the two premises provide absolute support for, and guarantee in a mathematical fashion, the certain truth and soundness of one correct conclusion. The doctrine of stare decisis is based on the assumption of an authoritarian major premise.
However, cases involving degrees of probative value of circumstantial evidence, such as those involving whether or not certain facts reach a certain standard or level of probative value, as in this case, present arguments that are not deductive but inductive,[7] in which the premises provide some, but never absolute, support for the conclusion. As Chief Justice Burger explains in United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), "The process does not deal with hard certainties, but with probabilities." Id., 101 S.Ct. at 695. The legal question of whether a law enforcement officer had, or did not have, probable cause to believe (or whether he was justified in having a founded or reasonably based suspicion of) the truth of a certain factual conclusion refers, not to the truth or accuracy of his conclusion (as shown by hindsight based on additional facts or later events), but to the inductive strength of the officer's factual basis and of the reasonableness of his deductions, that is, with the degree of support that the circumstances (the particular set of premises) provide for his particular hypothesis or conclusion. The basic characteristic of an inductive argument is that, even if all of its premises are true, it is still possible for the conclusion to be false, because the premises provide only partial support for the conclusion.[8] This partial support can range from strong, almost absolute support at one extreme, to weak, almost nonexistent support, at the other.
Since the premises of a valid deductive argument themselves absolutely necessitate (imply) the conclusion, the addition of new premises to such an argument does not affect the support which the two basic premises provide for the conclusion. The addition of premises (additional probative facts) to an inductive argument, however, may strengthen or weaken support for a particular conclusion. Inductive arguments are evaluated in terms of their relative strength; that is, whether one is stronger or weaker than another, and not by any determination that it must provide but one absolutely correct and certain conclusion. Inductive arguments are usually evaluated in terms of their relative inductive strength by comparing the ways in which the particular or unobserved case or proposed hypothesis or conclusion is similar to (bears a positive *793 analogy to) or different from (bears a negative analogy to) premises composed of a class of known (observed) cases or instances.[9] The greater the positive analogy between the observed and unobserved cases, the stronger the enumerative induction; the greater the negative analogy, the weaker the enumerative induction, other things remaining unchanged. As it relates to a police officer having reasonable grounds to believe or suspect that a particular person has committed a crime, much of what the officer draws upon as a premises of "observed cases" comes from his knowledge obtained by training and experience relating to the motives and methods of criminals. Those matters constitute the major premise of the inductive argument and the various facts in the case collectively constitute the minor premises from which a conclusion is drawn.
The word probable means it is "more likely than not" that a particular categorical statement or proposition is, or will be, true or that a particular event has, or will, occur. If absolute truth or certainty is assigned a probability of 1 and absolute falsity or impossibility is 0, then all probability lies between 0 and 1 and the sum of all inconsistent statements or alternatively possible events cannot exceed 1.[10] An event, not impossible, but less than likely to occur is a mere possibility; an event more likely than not to occur is "probable." Multiple events, each of which alone constitutes but a possibility, can aggregate to indicate probability.[11] This is why each set of additional facts suggesting the same conclusion (additional premises) increases the strength of an inductive argument. "Probable cause" means having reason, based on facts, to believe that a particular proposition is true or that a particular event has occurred or will occur. Suspicion is belief in a possibility not based on the existence of a factual premises sufficient to support a reasonable inference of probability. Suspicion can be "bare" when it is based on circumstances inferring only a weak possibility. Suspicion can be "reasonable" or "founded" when it is based on evidence and deductions indicating a strong possibility, but either (1) the evidence is, or (2) the implications are, too weak to support an inference of probability.
Now to the further facts in this case and to an examination, analysis and evaluation of the police officer's knowledge, experience, facts, deductions and conclusion. Sergeant Williams is entitled to an assumption that he knows[12] what trained police officers and others know as to the actions and reasoning of usual "reasonable and prudent" robbers, as well as any other personal knowledge and experience shown by the evidence. The education, experience and business of police officers is knowing their own community and criminals' activities, objectives, methods and thinking (modus operandi) and motives better than the criminal knows them.
*794 Sergeant Williams knew that Melbourne Beach was south of and adjacent to Indialantic and that both small seaside cities are located on what is effectively a very long, very narrow, island separated from the mainland in Brevard County by the Indian River. No heavily traveled highway connecting large centers of population goes through this area. One main road, State Road A1A, runs north and south through both cities and up and down the island. There is no bridge across the river from Melbourne Beach and none to the south except one near Wabasso in an adjoining county over twenty long desolate miles away.[13] From the robbery scene, the nearest causeway and bridge across the river is two or three miles north at State Road 516 (also known as Fifth Avenue) and runs from Indialantic across the river into the City of Melbourne. When Sergeant Williams heard the BOLO, he reasoned that the robbers would probably flee on foot only a short distance and would probably have a get-away car[14] and would probably attempt to escape the crime scene to avoid apprehension and that they would probably do this quickly, but cautiously, and that they would probably do so by way of the nearest route off of the island. On the basis of these assumptions and deductions, Sergeant Williams promptly positioned himself and other officers at the intersection of State Road A1A and 516 (Fifth Avenue) where, within two or three minutes after receiving the BOLO, he saw the Oldsmobile carrying appellees approach the intersection on State Road A1A from the south (from the direction of the crime scene) and, without giving a traffic signal, make a sharp (the car's tires "chirped") left turn onto to State Road 516 and head west toward the mainland at which time the officer commenced following (pursuing) it. The speed of the Oldsmobile constantly changed between the speed limit of 35 m.p.h. and 42 or 43 m.p.h.[15]
Under these circumstances, the police officer had ample reason to believe that the robbers, whoever they were, would more likely than not (probably) pass through the intersection of State Road A1A and 516. This deduction serves, of course, to create a suspicion of guilt as to a large group of persons, being all persons going through this intersection. Obviously, his first deduction and resulting suspect group includes a large number of innocent persons. The likelihood of any one randomly selected member of this suspect group actually being one of the robbers is small  a bare or remote possibility. A first narrowing of these suspicions can be done with the time factor. The factors here relating to time and distance, as relating to the motives and objectives of the perpetrators, suggests that the time when it would be most probable (more likely than not) that persons passing through this intersection would include the robbers would commence four to five minutes after the robbery, continued for five to ten minutes, and then taper off and, in the absence of unusual circumstances, substantially end ten or fifteen minutes later. Thus time substantially narrows the original suspect group and greatly increases the possibility and probability that the narrowed suspect group will contain the robbers. The next narrowing relates to the *795 direction of travel. Of all persons passing through the intersection during that time frame, we can further eliminate from suspicion all except those who approach from the south and turn west. Since persons approaching an intersection from each of four directions can do any of three things (turn right, turn left or go straight through) this second narrowing alone eliminates eleven out of twelve of the possibilities preceding it and again greatly enhances the possibility that the further narrowed suspect group will contain the robbers. There is now a reasonable working police hypothesis that possibility and suspicion is great that the fleeing robbers will be included within those persons now remaining in the suspect class, being all persons who during this narrow span of time approached this particular intersection from the south and turned west. The next factor is unfortunate because it relates to race and suggests a defense argument that the officer's consideration of that factor must necessarily be arbitrary and discriminatory as based on bias or prejudice. Not so. The officer, as well as the robbed night clerk, testified at the suppression hearing as a matter of fact that, while black persons are frequently seen in the area during regular weekday work hours, because they did not live in the area and because of the absence of places and activities they prefer, they are rarely seen in this area during weekends or after 6:00 p.m. at night. In fact Sergeant Williams personally knew that in all of Melbourne Beach and Indialantic there resided but one black family and the officer knew the members of that family were composed of an elderly lady and her grandchildren and that the occupants of the Oldsmobile were not of that family. The mere fact that the robbers were black is in and of itself immaterial, but color is one of the most common ways of distinguishing between objects otherwise similar and here the fact that the robbers were black serves to eliminate from the possibility and suspicion of guilt all persons not black, which in this instance eliminates over ninety-nine percent of all local residents that might remain in the previously narrowed suspect group. In fact, the officer's special knowledge of the one black resident family, coupled with the exclusion of all other (white) residents, eliminated from the suspect group all residents of Melbourne Beach and Indialantic. The officer noted that the Oldsmobile had a Palm Beach County tag.
This police officer's specialized knowledge, gained from training, education and experience relating to the usual conduct of criminals and his personal knowledge of the geographic, demographic and ethnologic features of the community he served, plus a few meaningful facts promptly relayed to him and certain deductions here examined, enabled him, by inductive analogy and generalization, to formulate a hypothesis or conclusion pointing a strong finger of probability at a select group of suspects. That group was out-of-town black males in a vehicle approaching from the south and turning west at the intersection of State Road A1A and 516 in the City of Indialantic in a narrow window of time centered about 10:35 p.m. on Saturday, January 24, 1981. Appellees clearly fell into that very small, exclusive group. Based on the whole picture  a reasonable hypothesis reasonably inferred or deducted from objective facts constituting circumstantial but probative evidence  Sergeant Williams had ample probable cause to suspect appellees of having committed this robbery, a felony. His fresh pursuit[16] and seizure of them was not arbitrary but was based on facts and logical deductions and was reasonable, justified and lawful. In overview, this was just not a good time and place for members of a highly distinguishable small minority group to commit a robbery and the police officer did a good job.[17] Upon this analysis of the *796 facts in this case in accordance with legal authority I agree that the order suppressing evidence seized as a result of the apprehension, seizure, arrest and search of appellees should be reversed and the cause remanded.
NOTES
[1] U.S.Const.amend. IV; Art. I, § 12, Fla. Const. The fourth amendment has been applied to the states via the fourteenth amendment, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and both the Florida and federal provisions have been construed as providing identical protection. State v. Hetland, 366 So.2d 831 (Fla. 2d DCA 1979), affirmed, 387 So.2d 963 (Fla. 1980) (adopting opinion of the district court of appeal). Additionally, Florida's stop and frisk statute, § 901.151, Fla. Stat. (1979), has been interpreted as imposing these same constitutional standards. State v. Hetland. Section 901.151 provides, in part:

Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county, he may temporarily detain such person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding his presence abroad which led the officer to believe that he had committed, was committing, or was about to commit a criminal offense.
[2] United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); Reid v. Georgia, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Hetland.
[3] Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979).
[4] Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Codie v. State, 406 So.2d 117 (Fla. 2d DCA 1981); Byrd v. State, 380 So.2d 457 (Fla. 1st DCA 1980), cert. denied, 398 So.2d 1352 (Fla. 1981); State v. Gamble, 370 So.2d 428 (Fla. 3d DCA 1979); State v. Stevens, 354 So.2d 1244 (Fla. 4th DCA 1978).
[5] U.S. v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).
[6] State v. Stevens, 354 So.2d 1244, 1247 (Fla. 4th DCA 1978).
[7] See I Wigmore on Evidence § 30 at 415 (3d Ed. 1940).
[8] This basic truth is what makes a fallacy of defense counsel's argument before the trial court that appellees could possibly have been mere innocent travelers on a public road. Unlike proof beyond a reasonable doubt in a purely circumstantial case where the evidence must exclude every reasonable hypothesis of guilt, a showing of probable cause proceeds only on the probability that facts and reasonable deductions combine to cause a reasonable person to believe that it is more likely than not that a particular hypothesis is correct  not that it cannot possibly be erroneous.
[9] Wigmore calls these subordinate tests "method of agreement" and "method of difference." I Wigmore on Evidence § 33 at 422 (3d Ed. 1940).
[10] The probability that any particular (favorable) event will occur can often be determined by dividing the number of possible favorable events by the total number of equally possible events. If all possible events are not equally probable, probability can be determined by relative frequency (by dividing the number of observed favorable events by the total number of observed events) or by establishing the initial probability of any single event based on the knowledge, training and experience of a particular observer. Although this latter is subjectively based, it can still be reasonable, as based on facts and reasoning from logic and experience, or arbitrary, as when based on mere emotion, sentiment or bias. An event which is equally likely to occur or not occur, such as the probability of getting a head on a single toss of a coin, stands at the point of indifference or .5.
[11] See, e.g., Spinelli v. United States, 382 F.2d 871 (8th Cir.1967), reversed, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).
[12] Unfortunately, trial counsel continually prevented this officer from explaining to the court the specifics of his training and experiences and how they provided his knowledge as to "known" cases and how that specialized knowledge constituted the unarticulated premises for the inferences he drew from the particular facts in this case. An officer's lack of opportunity or ability to articulate his deductions does not dismiss their validity, but only denies others the opportunity to ascertain them for analysis and evaluation.
[13] The confines and isolation and light use of SR A1A to the south obviously make it a less preferable escape route than to the north.
[14] The early day English robber could hope to avoid the resulting "hue and cry" on foot, but the modern day robber needs a get-away car to rapidly leave the scene of the crime to avoid the rapid communication and transportation facilities of present day law enforcement officers, who can normally be expected to converge on the crime scene promptly after alarm.
[15] Robbers being followed by an unknown vehicle would subconsciously want to flee rapidly but would know they should drive within the speed limit to avoid suspicion or arrest on traffic charges. An experienced police officer could reasonably read appellees' actions as resulting from a nervous, subconscious speeding up being constantly corrected and checked by a conscious awareness of the necessity to avoid speeding and suspicion. Even a honey bee with no reasoning powers guarding her hive can detect the robber bee in flight because it, being laden with guilt and apprehension rather than pollen and nectar, approaches a landing too high, too slow and too hesitantly.
[16] See § 901.25(1), Fla. Stat. (1979). Since we find probable cause existed before it occurred, we have not considered appellees' final suspicious act which occurred in the City of Melbourne, when all three passengers ducked down below the vehicle's windows and out of sight.
[17] For a factually similar recent case, see Plant v. State, 407 So.2d 966 (Fla. 1st DCA 1981). See also State v. Perera, 412 So.2d 867 (Fla. 2d DCA 1982). The law normally contemplates the solution of a legal problem by using an applicable constitutional or statutory provision or prior case adopting a rule or principle of law (stare decisis) as the major or law or authoritative premise, which, when paired with a minor premise composed of the facts in a subsequent case, constitutes a syllogistic deductive argument, the logical effect of which forces a proper conclusion in a later case. This method does not apply or work when the problem requires the analysis and evaluation of an inductive argument, which deals only with relevant facts and relationships in the real world, rather than the presence of an authoritarian major premise (correct because of its authority) and of internal consistency in the reasoning process, as is involved in the usual deductive argument. Problems involving the quantum and quality of evidence (proof), possibilities, probabilities, presumptions of fact, implications, inferences, and their strength, and the sufficiency of one fact as the inferential basis for proof of (belief in) another fact all involve the inductive process, as do questions as to foreseeability and reasonableness, such as reasonable care, reasonable value, reasonable child support, and other matters with a subjective basis.

Problems requiring use of the inductive process (a concept of logic, a branch of philosophy) are not subject to solution by a deductive argument in which one premise is an authoritative rule of law because law (man-made authority) cannot control the nature of the reasoning process involved in an inductive argument any more than law can control other natural forces and laws such as those of mathematics, physics, science and psychology. Even the implicative value of the data in one inductive argument has little, if any, relevancy as to that in any other inductive argument and is certainly not controlling in the other. An inductive argument in one law case, even a factually similar one from a high court whose precedents are binding, cannot constitute a binding premise in a similar subsequent inductive legal argument and is never dispositive of the later case. This truth is what bothered Judge Smith in Palmer v. State, 323 So.2d 612 (Fla. 1st DCA 1975); see especially note 7 in that case. A law case, such as U.S. v. Cortez, involving an inductive argument, constitutes, at best, but an example, instructive as to the method of correctly evaluating an inductive argument. Unfortunate as it is that analysis of inductive reasoning is difficult because of the highly intricate nature of the probability theory, nevertheless, it is insufficient to merely cite or recite the facts in another, albeit authoritative, case involving an inductive argument and then merely announce a decision in the later case.
When the law provides a clear rule of law based on objective criteria, its application as the authoritative premises of a deductive argument not only permits the rule to be more uniformly and equally applied but also permits its application to be more closely reviewed. However, when the law has been unable to formulate a definite rule of law or standard or guide and provides only a vague standard based on subjective criteria and opinion, an inductive argument results, there is much disparity in conclusions in similar cases and appellate review is either a difficult analysis or a mere substitution of opinion for that below. The law considers most of the problems it leaves to be solved by the inductive process to be "findings of fact" not subject to judicial review. In the few legal arguments that are inductive in nature, such as "probable cause" in this case, to determine whether the conclusion is well founded, the strength of each of its premises and implications must be analyzed and evaluated because its rationale is reasoning. Courts must use reasoning, not authority, to solve inductive legal arguments, because in such cases law departs from justice as well as common sense when it relies on brute authority as a substitute for careful inductive reasoning based on the particular facts in the case at hand.