SHEPHERD, J.
 

 This is an appeal from an order suppressing marijuana found in the defendant’s, Kenneth James Outler, automobile after a stop, on the ground law enforcement lacked reasonable articulable suspicion to make the stop under the Fourth Amendment to the United States Constitution and its Florida counterpart, Article I, section 12 of the Florida Constitution.
 
 [1]
 
 
 *423
 
 Upon de novo review, we conclude the trial court erred in reaching its judgment and, therefore, reverse the order on appeal.
 

 This case arises out of an investigatory stop. In order not to violate a citizen’s Fourth Amendment rights, an investigatory stop requires a well-founded, articulable suspicion of criminal activity.
 
 State v. Taylor,
 
 826 So.2d 399, 402 (Fla. 3d DCA 2002). Neither speculation nor a mere “hunch” is acceptable.
 
 Terry v. Ohio,
 
 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, the quantum of suspicion required is less than that for probable cause and “considerably less than proof of wrongdoing by a preponderance of the evidence.”
 
 United States v. Sokolow,
 
 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989);
 
 State v. Lennon,
 
 963 So.2d 765, 768 (Fla. 3d DCA 2007);
 
 State v. Gonzalez,
 
 682 So.2d 1168, 1170 (Fla. 3d DCA 1996). The trial court determination is made upon a consideration of the totality of the circumstances.
 
 Taylor,
 
 826 So.2d at 402. On review of a trial court ruling, the appellate court is required to accord a presumption of correctness to the trial court’s determination of the historical facts, but independently review mixed questions of law and fact that ultimately determine the constitutional issues arising in the context of the Fourth Amendment.
 
 State v. Bagley,
 
 844 So.2d 688, 690 (Fla. 3d DCA 2003). Thus, the trial court’s ultimate determination is reviewed de novo on appeal.
 
 Id.
 

 This case originated out of a telephone call made on April 11, 2006, by Michael Martinez, a detective with the Los Angeles Impact Task Force, to United States Drug Enforcement Administration (DEA) Special Agent Matthew Roberts.
 
 [2]
 
 Martinez told Roberts the Los Angeles police had seized several crates of marijuana from a Los Angeles trucking company, and the trucking company was carrying a similar crate to Tiffany Transport in Miami-Dade County. He described the crate to Roberts and advised him the shipping name and address were fictitious.
 

 That afternoon, Roberts, accompanied by five other federal agents and two local law enforcement officers — Miami-Dade Detective Guillermo Cuba and Coral Gables K-9 Officer Bill Swikehardt — visited Tiffany Transport and inspected the crate. One agent diverted to check the delivery information on the accompanying crate and found that, like the shipping information, the delivery name and address also were fictitious. Officer Swikehardt exposed his drug-trained canine to the crate, but the dog did not alert. Special Agent Scott Rosenfeld, one of the six agents on the site, was not surprised. He told the assembled officers the crate was similar in size, weight, and packaging to crates being used in another marijuana trafficking scheme he was investigating. His investigation in that case had revealed the drug smugglers there had a practice of pre-packing the contraband in cardboard boxes before laying them into the crate, then
 
 *424
 
 baffling the interior of the crate with oily paper towels and dryer sheets to mask the telltale marijuana odor, and finally securing the crate “excessively,” using a combination of nails, screws, glue, and metal banding.
 

 Because the canine failed to alert, the assembled officers were unable to obtain a search warrant. On the other hand, a Tiffany Transport representative told the group that Kenneth Outler, an individual who recently had picked up two other similar crates, was on his way to Tiffany Transport to pick up this one. The officers and agents took positions to observe.
 

 Outler arrived at Tiffany Transport as expected, at approximately four o’clock in the afternoon. A Tiffany forklift operator transported the crate to Outler’s car, where it was opened, and the boxes removed and placed in the trunk and on the back seat of Outler’s car. Outler then departed to the Palmetto Expressway and traveled north, then east. The DEA agents and local law enforcement officers sought to trail him surreptitiously in six or seven separate vehicles, in what one pursuing officer described as a “rolling tail.” After getting beyond rush-hour traffic on the expressway, Outler increased his speed to between sixty and eighty-five miles per hour, as conditions would permit, in what was a fifty-five-mile-per-hour zone. He also weaved back and forth between lanes frequently and, according to Special Agent Roberts, checked his rearview mirrors “excessively.” Roberts testified he was left with the impression Outler suspected he was being tailed. Although one of the local law enforcement officers testified he could have pulled Outler over for excessive speed — apparently, federal agents do not have the authority to make traffic stops— he elected not to do so because he was traveling in an unmarked car. Instead, the agents and officers called for another Miami-Dade officer in a marked car to join them to make the stop.
 

 Before that officer could arrive, Outler left the expressway at Northwest 27th Avenue and proceeded south into a residential area. Both the federal and local law enforcement officers followed. Outler drove hastily through the neighboi-hood, utilizing the middle of the two-lane residential streets on which he traveled, made frequent right and left turns from block to block, and did not honor stop signs. For community safety reasons, local law enforcement officers elected to stop him, even though the marked car had not arrived. The two local law enforcement officers, together with one other local law enforcement officer in an unmarked car who had joined the chase, blocked Outler’s vehicle in the front. Federal officers came up behind. Federal officers then approached Outler’s vehicle, guns drawn. As Outler rolled down his car window, the agents detected the unmistakable odor of marijuana wafting from the vehicle’s backseat and ordered Outler out of the car. A canine that accompanied the joining law enforcement officer quickly and unambiguously alerted to the marijuana in the vehicle. Outler was Mirandized,
 
 [3]
 
 consented to the opening of the boxes, and was formally arrested after a few of the cardboard boxes were opened.
 

 Taking all of the circumstances into account in this case,
 
 see Taylor,
 
 826 So.2d at 402, we have no difficulty concluding on de novo review, the law enforcement officers in this case had reasonable articulable suspicion to stop Outler. Although urged by the State to conclude the stop was an objectively lawful traffic stop, we conclude the stop that occurred here was clearly an investigatory stop.
 
 See id.
 
 We determine the officers had reasonable articulable suspicion to make the stop from the following
 
 *425
 
 undisputed facts: (1) the officers knew the crate in question had come from a shipping company in Los Angeles from which numerous similar crates had been seized and found to contain marijuana; (2) the officers had on hand DEA Agent Rosenfeld, who related he personally was investigating a marijuana trafficking conspiracy involving crates of similar weight, build, and packaging; (8) employees of Tiffany Transport related that Defendant had picked up two similar crates in the past; (4) neither the senders address in Los Angeles nor the destination address in Miami could be verified by the DEA to exist; and (5) once broken down, the wooden crate was found to contain several cardboard boxes, just as Agent Rosenfeld described from his other investigation. All this information was known to the officers when they were still at Tiffany Transport, long before Outler began his suspicious sojourn down the Palmetto Expressway. Defendants erratic and evasive driving— which apparently coincided with his realization he was being tailed — only served to increase the reasonableness of the officers suspicion.
 
 See State v. Goebel,
 
 804 So.2d 1276, 1277 (Fla. 5th DCA 2002) (evasive driving may serve as one factor among many in a finding of reasonable articulable suspicion);
 
 accord State v. Smith,
 
 529 So.2d 1226, 1227 (Fla. 3d DCA 1988);
 
 Harrison v. State,
 
 442 So.2d 427, 429 (Fla. 5th DCA 1983);
 
 State v. Jones,
 
 417 So.2d 788, 789 (Fla. 5th DCA 1982).
 

 Upon a review of the totality of the circumstances, we conclude the trial court erred in finding the federal agents and local law enforcement officers lacked reasonable articulable suspicion to stop Outler in this case.
 

 Reversed.
 

 [1]
 

 . In 1982, the people of the State of Florida amended their constitution to require that the rights afforded thereunder "shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court.”
 
 See
 
 Am. H.J.R. 31-H, 1982, adopted 1982. The amendment hobbled, but probably did not totally eliminate the utility of Article I, section 12.
 
 See Bernie v. State,
 
 524 So.2d 988, 997 (Fla. 1988) (Kogan, J., concurring in part, dissenting in part);
 
 see also Perez v. State,
 
 620 So.2d 1256 (Fla.1993); Thomas Marks, Jr.,
 
 Now You See It, Now You Don't, Privacy and Search and Seizure in the Florida Constitution: Trying to Make Sense Out of a Tangled Mess,
 
 67 Alb. L. Rev. 691, 696, n. 27 (2004).
 
 But see State v. Ridenour,
 
 453 So.2d 193, 194 (Fla. 3d DCA 1984) (Hubbarl, J., concurring).
 

 [2]
 

 . Outler contended below the entirety of this telephone conversation was inadmissible hearsay because Detective Martinez did not testify. That is not so.
 
 See Voorhees v. State,
 
 699 So.2d 602, 609 (Fla.1997) (imputation of collective knowledge of police from two different states investigating the same crime);
 
 see also State v. Peterson,
 
 739 So.2d 561, 566 (Fla.1999) (quoting
 
 United States v. Wilson,
 
 894 F.2d 1245, 1254 (11th Cir.1990)) ("Moreover, when a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause.”);
 
 Johnson v. State,
 
 660 So.2d 648, 664 (Fla.1995) ("Under the fellow-officer rule, information shared by officers investigating a crime is imputed to any one of their number, even those from different agencies working together.
 
 Polk v. Williams,
 
 565 So.2d 1387 (Fla. 5th DCA 1990). This effectively means that hearsay from other officers can be repeated by the affiant officer to establish probable cause.”).
 

 [3]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).