490 So.2d 104 (1986)
STATE of Florida, Appellant,
v.
Joseph AUGUSTYN, Appellee.
No. 85-481.
District Court of Appeal of Florida, Second District.
May 2, 1986.
Rehearing Denied June 30, 1986.
Jim Smith, Atty. Gen., Tallahassee, and Davis G. Anderson, Jr., Asst. Atty. Gen., Tampa, for appellant.
James Marion Moorman, Public Defender, and Paul C. Helm, Asst. Public Defender, Bartow, for appellee.
HALL, Judge.
In its criminal prosecution for theft, burglary, and possession of a firearm, the state of Florida seeks this court's review of the trial court's suppression of evidence alleged to be stolen property. We accept appellant's argument that the initial stop of appellee's van was valid; therefore, the consents given by appellee to search both his van and his house were valid, and the yielded evidence was admissible. The trial court's order suppressing the evidence is therefore reversed.
The events of this case began when an informant called a deputy and told him that a certain individual who lived near him was involved in numerous burglaries. This deputy referred the informant to a Detective Weinstein who was patrolling the informant's neighborhood. On September 4, 1984, the informant called Detective Weinstein and told him that he lived behind a certain individual who was involved in numerous burglaries and who had the stolen property in his residence. He described the vehicle being used to transport the stolen property as an older model, blue, customized, Ford van. Detective Weinstein told the informer that if the van returned and began to move the stolen property he was to call the police dispatcher. Several hours later that same evening, a police dispatcher called Detective Weinstein with the message that an older model, blue, customized, Ford van was in the process of moving stolen property in the Odessa area.
Detective Weinstein immediately contacted a Detective Longworth, who was in the *105 area, and asked him to be on the lookout for the van. Longworth then proceeded to the area of Ogden Circle to meet a Detective Wilke. At this time he did not see a Ford van. Detective Wilke met Detective Longworth in a Kwik Trip parking lot about one-half mile from Ogden Circle, and while they were discussing the Ford van, an older model, blue, customized, Ford van pulled into the parking lot. As soon as the driver of the van saw them, he turned the van around and went back the same way he had come. Wilke followed the van out of the parking lot. The driver of the van then went back down the road and embarked on a U-turn course. Wilke eventually was told to stop the van and did so. Appellee was advised of his constitutional rights by Detective Longworth. Detective Longworth used the Miranda card to advise appellee of his rights. The detective asked if he could look in the van, and appellee responded that he could. The detective then secured a written consent to search the van. The van was empty, except for a black and white television set. Appellee then took the deputies to his home, where he produced a driver's license. The detectives then asked for and secured a written consent to search appellee's home. Longworth then searched appellee's home and found the stolen property.
At trial the court agreed to hear arguments on a motion to suppress the evidence after both appellant and appellee stipulated that the court could grant a mistrial if it suppressed the evidence so as to preserve the state's right to appeal.
Appellant raises four issues on appeal. We address the arguments pertaining to the legality of the van's initial detention and to the effect upon the ensuing consents given by appellee to search both the vehicle and his residence as indicated below.
This court has repeatedly held that in order to stop an automobile and request identification from its occupants it is not necessary for the police to have probable cause; rather, it is required that the officer have a founded or reasonable suspicion which requires further investigation, State v. Lewis, 406 So.2d 79 (Fla. 2d DCA 1981); Lewis v. State, 337 So.2d 1031 (Fla. 2d DCA 1976), or which has some factual foundation in the circumstances observed by the officer when interpreted in light of the officer's knowledge. Watts v. State, 468 So.2d 256 (Fla. 2d DCA 1985).
To justify such a stop a police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968). The circumstances which will justify an investigatory stop must reasonably indicate that the individual is engaged in criminal activity or else the stop is illegal. § 901.151, Fla. Stat. (1977); Whitley v. State, 349 So.2d 840 (Fla. 2d DCA 1977).
While acknowledging the holding of State v. Hetland, 366 So.2d 831 (Fla. 2d DCA 1979), which disallows detentions based on vague descriptions, we decline to apply it to the instant case where the aggregate circumstances supported a reasonable suspicion of appellee's involvement in the crimes of burglary and theft.
An informant reported that an individual who lived behind him was involved in numerous burglaries and was harboring stolen property in his residence. This individual was reported to drive an older model, blue, customized, Ford van.
At 9:30 p.m. on the evening of the events at issue, a Pasco County deputy received an informant's message from a Dade City dispatcher that an individual in an older model, blue, customized, Ford van was in the process of moving stolen property out of the Odessa area. The informant had previously reported this activity and was told to call the authorities as soon as he observed it again.
The deputy patrolled the vicinity of appellee and informant's neighborhood and did not initially observe or encounter the van. The deputy then proceeded one-half a mile to a convenience store, where he met another deputy. While the deputies were *106 discussing the Ford van, the van pulled into the parking lot and immediately turned around and left. The deputies followed the van, observing it take a U-turn course and go back down the road. The deputies continued to follow the van, eventually stopping it.
One of the officers issued prompt, cautionary Miranda warnings and asked appellee to produce his driver's license. Appellee was unable to do such but consented to a search of his van. After the van was searched, he asked the officers to accompany him back to his house to retrieve his license. He produced his license and thereafter executed a written consent to search his house. This search yielded the incriminating evidence which the court suppressed at trial.
We conclude that there was a sufficient basis for stopping appellee's van and that the subsequent consents were free of taint, thus precluding any application of the "fruits of the poisonous tree" analysis.
Of crucial significance to this position to reverse the trial court's determination of the stop's illegality is the temporal proximity between all of the events involved. No appreciable period of time lapsed between the initial call, the police response, and the eventual sighting of the van. It should also be noted that the location in issue is not densely populated, making it more reasonable to be suspicious of the van.
It is clear to us that the officers acted on the required standard of reasonable suspicion in stopping appellee's van. Watts v. State. Accordingly, we deem the stop of the van and the ensuing consents legal and the yielded evidence untainted.
Reversed and remanded with directions consistent with this opinion.
CAMPBELL, A.C.J., concurs.
LEHAN, J., dissents with opinion.
LEHAN, Judge, dissenting.
I respectfully dissent. There are in this case two questions relating to whether a stop of a vehicle by a law enforcement officer based upon an informant's tip was proper. I believe the answer to each calls for an affirmance.
The first question involves whether the description of the vehicle provided by the informant was, under all the circumstances, sufficiently specific to have been properly relied upon by the officer as a basis for stopping the vehicle, assuming that the trustworthiness of the information provided by the informant had been established. This question was answered in the negative by the trial judge when he granted the motion to suppress. There is no issue as to whether the trial judge considered the correct law in this respect. The issue is whether the law which he considered was applied by him correctly under the particular facts of this case. The second question involves whether the trustworthiness of that information had been sufficiently established to allow the officer to rely upon it as a basis for stopping the vehicle. The second question does not appear to have been directly considered by the trial judge nor need he have considered it if he was correct in his answer to the first question.
My grounds for this dissent are as follows. As to the first question, I believe we should not conclude, as grounds for reversal, that the trial judge was wrong in deciding that the description provided by the informant of an older model, blue Ford van, customized in some unspecified way, with no description of the occupant or occupants, was not specific enough to provide the officer with a proper basis to stop a vehicle of that general description an unestablished time after, and one-half mile away from the scene of, reported criminal activity. I believe we should not reverse the trial judge for deciding, in effect, that the rights of innocent persons would be improperly jeopardized if a general description of the type involved here provided a sufficient basis for a police stop of any vehicle of that description under the circumstances of this case. As to the second question, I believe there was proper basis for a conclusion that the informant's trustworthiness had not been established in the *107 manner called for by the United States Supreme Court and by Florida case law. I believe there was no proper basis for concluding that the information that the van had been transporting stolen goods was trustworthy. The information was given by an informant who was unidentified and undescribed in these proceedings and who gave no basis whatsoever for his or her purported knowledge. Accordingly, there are two alternative grounds for affirming the suppression of the evidence.
The trial judge granted the motion to suppress for reasons apparently like my grounds for affirming as to the first question. But even if he was not correct in his answer to the first question, we are bound to affirm if, as I believe, the answer to the second question required the same result. A trial court's right decision must be affirmed even if it is made for the wrong reason.
On the grounds explained below as to each of those two questions, I believe the law does not support a reversal and requires our affirmance.
As to the First Question: Under the Circumstances of This Case an Appellate Court Should Not Conclude That the Trial Judge Was Wrong in Saying That the Information Provided by the Informant Was Too General.
Under this category there are two basic reasons which in my view call for our affirmance. First, I believe an appellate court should not substitute its judgment for that of the trial judge in a close case like this involving essentially a judgment call as to whether the description of the vehicle justified its stop by a law enforcement officer under all the circumstances. Second, I believe the application of the law by the trial judge cannot be said to have been inconsistent with the case law, such as State v. Hetland, 366 So.2d 831 (Fla. 2d DCA 1979), approved, 387 So.2d 963 (Fla. 1980), and Lewis v. State, 337 So.2d 1031 (Fla. 2d DCA 1976). Those cases require, in order to justify a stop of a vehicle suspected of being involved in a crime, a description of the vehicle which is more than vague and general.
As this court said in Hetland, "[A] vague description simply would not justify a law enforcement officer in stopping every individual who, or every vehicle which, might possibly meet that description." 366 So.2d at 839. In Lewis, which was cited in Hetland in support of the above quoted proposition, this court disapproved of a stop based upon a description of a Volkswagen which could be thought to have been not substantially less general than the description of the vehicle in this case but, in contrast to this case, did at least include information about the race, number and sex of the occupants. The description in the 1976 Lewis case was of a red Volkswagen carrying two white males who had been selling drugs; a car meeting that description was stopped by law enforcement officers at a considerable distance from the scene of the alleged drug sale. Compare State v. Delgado, 402 So.2d 41 (Fla. 3d DCA 1981) (stop proper based upon description of red and white car like that used in "Starsky and Hutch" television series, occupied by two white males, when vehicle was found three miles from reported crime scene "in a matter of seconds" after report was received), with L.T.S. v. State, 391 So.2d 695 (Fla. 1st DCA 1980) (stop improper where description of liquor store robbers was of at least two white males with curly hair, officer stopped car about one mile from liquor store, and car had three white males and one white female, two or three of whom had "fairly bushy" hair; court said description lacked specificity).
The Third District's discussion in Delgado seems especially pertinent. Delgado found that the stop in that case was proper due to the existence of three factors:
1. The vehicle both described and actually seen was a distinctive and unusual one. (Citations omitted.)
2. The vehicle was seen within a close and fully consistent proximity of time and place to those of the crime. (Citation omitted.)

*108 3. The vehicle was occupied, as ... reported, by two white males. (Citation omitted.)
402 So.2d at 42. In contrast, in the case at hand I believe the record does not show that the trial judge was without basis for concluding, as to the first two factors, that the vehicle described to and seen by the officers was not distinctive and within both a close time and place proximity to those of the purported criminal activity. (Indeed, in this case there was no reason other than the tip  which contained no basis of the informant's purported knowledge  to conclude that there had been criminal activity.) Also, as to the third factor there was in this case absolutely no description of the occupant or occupants of the vehicle, nothing even as to their number, race, or sex. The Third District in Delgado noted that "any one of these factors might not be sufficient to validate the stop" but that "the co-existence of all of them" did. 402 So.2d at 42-43. In the case at hand I believe the record does not show that the trial judge was without basis for concluding that none of those three types of factors had been shown. In L.T.S. the First District quoted from Hetland and pointed out that there was no indication in L.T.S. that the road on which the car was stopped by the police was fairly untraveled or that it was one of the few routes from the scene of the crime. 391 So.2d at 696. Those deficiencies in the evidence are identical to the situation here where there was no testimony whatsoever providing evidence of that kind.
The stop of the vehicle in this case may well have been justified if it had been made in the neighborhood in which a vehicle of that general description had been reported by the informant to be engaged in unlawful activities. But here the stop of the generally described vehicle was made one-half mile away after the passage of some time. The majority opinion relies upon the temporal proximity of the events as being of crucial significance to support the stop under those circumstances. But the time period which was of significance was the period between the time the van was reported by the informant to be in the location indicated by the informant and the time it was seen by the officers in the parking lot. The trial judge made a point of noting the lack of evidence involving that time period. He noted that the evidence did not reveal how long it took the dispatcher to relay the call from the informant to one detective, how long the detective took to contact two other detectives who responded to the call (although the detective testified that he acted "promptly"), how long it took the other detective who went to the location indicated by the informant to respond to the call, arrive at the location, and ascertain that there was no such van in that vicinity, and how long it took him to then proceed to the parking lot where he met the other responding detective. Although the officers' testimony referred generally to various times, that testimony was vague and inconsistent. It appeared that the officers actually did not remember the times, as one of them conceded, and the trial judge obviously reached that conclusion. We, not having seen or heard the witnesses, are in my view not entitled to draw a contrary conclusion. See State v. Webb, 398 So.2d 820, 827 (Fla. 1981) (England, J., concurring) (As to a trial judge's findings at a suppression hearing involving "the specificity of the information given ... [and] time and space relationships between the tip and the stop ... [t]he fact that appellate judges think otherwise is irrelevant ... [unless] the trial judge abused his discretion to evaluate the evidence and rule on the reliability of the tip.")
The majority opinion states that the detective who responded to the call and went to the location indicated by the informant had been in that area when he received the call. However, the record shows that he had been in his office and does not show the location of his office in Pasco County or whether there was a sheriff's office in or near Odessa where these events took place. There was testimony that the detectives had been in the parking lot ten or fifteen minutes before the van appeared. But, *109 again, the elapsed time which was of significance was not simply that ten or fifteen minutes and could have been very substantially longer. Indeed, following, as we should, a presumption of correctness of the trial judge and recognizing that the state had the burden of proof to establish the validity of the stop, we should assume it was very substantially longer. How long would be too long in that respect, or, perhaps more to the point, how short would be short enough to establish sufficient "temporal proximity," is, I believe, not something upon which we can base a reversal of the trial judge under this record.
The majority opinion further relies upon the area involved being not densely populated, thus "making it more reasonable to be suspicious of the van." It is well known that Odessa is by no means a metropolitan area. Nonetheless, the record is silent as to how populated the particular area involved was and, therefore, how much more reasonable the stop was in that area than in a more densely populated area. The record does not show whether the one-half mile between the location where the van was initially reported and the place where the officers first saw the van was rural and unpopulated or was residential.
There are two incidental aspects which might seem to lend support to the validity of the stop but which do not and might, in fact, be considered to have a somewhat contrary significance. First, the record would not seem to justify any conclusion that when the van pulled out of the parking lot at night and was followed by a law enforcement officer it was fleeing from the officer. The officers were in plain clothes in two unmarked cars and are not shown to have identified themselves before one of them followed the van. Therefore, the record would support a conclusion that if the driver of the van was trying to get away from the car which was following, he may have been justified in doing so. Second, there is nothing in the record even indicating that the black and white TV set which was found in the van at the time of the initial stop was then suspected of having been stolen. There was absolutely no indication from the van that defendant was involved with stolen property. It was not until the subsequent search of defendant's home, which the trial judge found to have been tainted as the fruit of an unlawful stop, that there was any substantial basis to conclude that defendant was a person referred to by the informant as having been involved with stolen property. In fact, the record does not show that the officers had been looking for stolen property like a TV set. It does show they had been looking for stolen meat.
Therefore, I believe the trial judge's suppression of the evidence on the basis of his conclusion that there was an unlawful stop was not without foundation unless defendant's consent to the subsequent search of his home (which, incidentally, was not the location where the van had been reported by the informant to be) was voluntary. But consent obtained after unlawful police activity is presumptively tainted and rendered involuntary. "The consent will be held voluntary only if there is clear and convincing proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint of prior official illegal action." Norman v. State, 379 So.2d 643, 647 (Fla. 1980). See also Tennyson v. State, 469 So.2d 133 (Fla. 5th DCA 1985). In this case, the consent to search was apparently obtained after the officers had followed defendant to his home. As in Norman, there is no showing in this case that at any time after the stop up through the consent defendant was free to leave the presence of the officers. "Whether or not consent has actually been given or is simply a manifestation of consent produced by coercion is a question for the trial judge, and his determination must be accepted on appeal unless clearly erroneous... ." James v. State, 223 So.2d 52, 56 (Fla. 4th DCA 1969).
I would uphold the suppression of the evidence because I feel we should not disagree with the trial judge's rulings that the initial stop of the van was unlawful and that defendant's consent to the subsequent search of his home must be deemed involuntary *110 because the consent was fruit of the poisonous tree.
The trial judge's suppression of the evidence might conceivably have made this seem to be a case in which a criminal would go free based upon a technicality. But the validity of a police stop or search is not to be judged by hindsight as to whether or not the results produced incriminating evidence. "[H]indsight [should not be] coloring the evaluation of the reasonableness of a search or seizure." United States v. Martinez-Fuerte, 428 U.S. 543, 565, 96 S.Ct. 3074, 3086, 49 L.Ed.2d 1116, 1133 (1976). The underlying rationale for the trial judge's rulings was doubtless that if general descriptions of the type involved here would justify police stops and searches of any citizens who meet those descriptions at times and locations substantially removed from the vicinity where criminal activity was reported, the liberties of many innocent citizens could be infringed upon. And there is no disagreement that basic to our constitutional form of government under the Bill of Rights is the concept that avoiding infringements upon the liberties of many citizens justifies sacrificing the opportunity to convict one criminal. "It is better that ten guilty persons escape than that one innocent suffer." 4 W. Blackstone, Commentaries on the Laws of England, ch. 27 (1765). "The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." Mapp v. Ohio, 367 U.S. 643, 659, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081, 1092 (1961).
This is not to say, based upon the record now in this appellate court, how I, or any judge of this court, would likely have ruled in the trial judge's place. That is not the issue. Also, this is not to say that the record shows that a denial of the motion to suppress would have been without any foundation. It is to say I believe that the trial judge's granting of the motion was not without foundation and that we are obliged not to disturb it.
The ruling of the trial court on a motion to suppress, when it comes to the reviewing court, is clothed with the presumption of correctness, and the reviewing court will interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustain the trial court's ruling.
McNamara v. State, 357 So.2d 410, 412 (Fla. 1978). See also State v. Webb, 398 So.2d at 826.
As to the Second Question: The Trustworthiness of the Tip Had Not Been Established in the Manner Called for by the United States Supreme Court and by Florida Case Law.
The stop of the van was not made on the basis of any personal observation or knowledge of the law enforcement officers that the driver of the van may have committed or may have been committing a criminal offense. Nonetheless, if an informant's tip has sufficient indicia of trustworthiness, it can itself serve as a proper basis for a reasonable suspicion resulting in a valid stop. See Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); State v. Webb; State v. Hetland. But there were in my view substantial grounds for concluding that insufficient such indicia existed here. I believe this aspect is important enough not only as a reason for affirming this case but also as precedent for other cases to justify taking some pains to explain the reasoning of this dissent.
Whether or not there were under the facts of a particular case sufficient indicia in this respect can be determined, I believe, by applying the test set forth in Illinois v. Gates, 462 U.S. 213, 233, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527, 545 (1983). Under Gates the trustworthiness of a tip can be established by evaluating the circumstances and applying a test as to (1) the informant's reliability or veracity and (2) the informant's basis of knowledge. See Leisure v. State, 437 So.2d 751, 753 (Fla. 1st DCA 1983). This test was earlier stated in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), at a time when *111 each prong of the two-pronged test must have been shown. See also Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). But under Gates the application of the test was modified so that those prongs "are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." 462 U.S. at 233, 103 S.Ct. at 2329, 76 L.Ed.2d at 545.
There are three particular aspects of the law involving that two-pronged test which bear clarification: (A) Hetland and Webb, leading pre-Gates case law in Florida with respect to a stop based upon an anonymous informant's tip, while not purporting to apply the two-pronged test, actually applied the substance of the second prong of that test, as explained below. Because in the case at hand there was no testimony identifying or describing the informant this case should also be treated as involving an anonymous informant's tip; (B) the terminology of that pre-Gates Florida case law may be reconciled with the terminology of the two-pronged test; and (C) the first question dealt with in this dissenting opinion as to whether information provided to a police officer by an informant is specific enough to permit the officer to distinguish a suspect from innocent people is closely related to the second prong of the two-pronged test. That clarification is undertaken as to each of those aspects as follows:
(A) As indicated above, this area of the law, which, I believe, calls for application of the two-pronged test, involves stops by police based not upon police observation of activity leading to a reasonable suspicion of unlawfulness, but based only upon information by an informant as to purported unlawful activity. Hetland and Webb, which are leading cases in this area and were pre-Gates, did not specifically refer to the two-pronged test, notwithstanding that the test had by then come into existence under Aguilar. The reason why Hetland and Webb did not refer to that test could well have been that prior to Gates the two-pronged test simply could not work in an anonymous tip situation like that in Hetland and Webb (where there was, of course, no information as to the first prong) because, as pointed out above, both prongs must then have been established to justify a stop. Accordingly, those cases seem to have treated anonymous tip situations as involving a sort of separate type of subject within this general area, i.e., separate and apart from the two-pronged test. But it appears clear that those cases actually were dealing with the same thing as does the second prong: they were dealing with whether there was, in connection with an informant's tip, a showing of a basis of knowledge by the informant which provided sufficient indicia of the trustworthiness of the tip to justify police action. As Webb says with regard to an anonymous tip (where, of course, the reliability of the source of the tip cannot be evaluated), "Hetland holds that we may also look to the information provided by the tip and determine its reliability by the specificity of the information and its corroboration by prompt police action... ." 398 So.2d at 823. This is essentially what the Gates description of the second prong deals with, as is further shown below.
Now, after Gates, because there may be sufficient indicia of such trustworthiness in a particular case simply from the second prong (if, as Gates says, there is a "strong" showing of the second prong), it seems entirely appropriate to reconcile Hetland and Webb with the prevailing case law under Gates as to police action based solely upon an informant's tip. This is illustrated in Tippins v. State, 454 So.2d 630, 631 (Fla. 5th DCA 1984), where the Fifth District cited both Gates and Hetland for the proposition that information in an anonymous tip, in order to justify a temporary detention of a suspect, must be sufficiently detailed and corroborated.
(B) The term "reliability," which is, strictly speaking, only referred to in the first *112 prong of the two-pronged test, was used in the Webb and Hetland pre-Gates discussions concerning the same subject as that involved under the second prong. For example, Webb referred to "information [in an informant's tip] bearing sufficient indicia of reliability to warrant a stop... ." 398 So.2d at 826. This is not illogical because, while only the first prong under the Gates articulation of the two-pronged test contains the word "reliability," actually both prongs deal with the broad subject of the reliability of an informant's tip. In general, the first prong of the test may relate to whether there was any past history of the informant having provided valid information, and the second prong may relate to whether the nature of the information provided sufficient corroboratable specificity to indicate that the informant was trustworthy; corroboration may be from the observations of law enforcement officers. See Gates and the additional discussion of Gates, infra. To attempt to alleviate possible confusion of terminology in this respect this dissenting opinion uses the broad term "trustworthiness" to refer to the requirements of both prongs together and, consistent with the literal two-pronged test, uses "reliability" only with reference to the first prong.
(C) The second prong of the test is similar to the first question addressed in this dissenting opinion  whether information provided to police is specific enough to permit them to distinguish a suspect from innocent people. That first question simply provides a somewhat less involved approach dealing, as does the second prong, with the specificity of the information provided by an informant but only in the context of whether the information sufficiently permits law enforcement officers to distinguish a suspect from innocent persons, rather than whether, as under the second prong, it provides sufficient indicia of the trustworthiness of the informant's tip. The pursued end product of that first question is, therefore, not the same as that of the second prong of the two-pronged test. But the degree of specificity of information provided by an informant may serve to determine whether either of those end products exists.
Accordingly, the discussion above about the first question may also be apropos to the second prong of the test. That is, if information about a purported criminal is specific enough to distinguish a suspect from innocent persons, it also might be specific enough to show the trustworthiness of the informant's tip. But, as explained below, in order to establish the trustworthiness of a tip if there is nothing, for example, in the nature of a "track record" of the informant to support the first prong of the test, there should, under the second, basis of knowledge prong, be something not only distinguishing the suspect from other people but also showing that, and perhaps how, the informant knew, as his information purported to say, that the suspect was involved with a crime.
Now, referring again to the facts of the instant case, the unidentified informant here was not really anonymous; he was apparently known to the officer who originally took his call and who then referred the informant to Detective Weinstein. However, at the hearing on the motion to suppress, the defense objected on a hearsay basis to the question to Detective Weinstein about the informant's past reliability, the first prong of the two-pronged test. The trial court sustained that objection evidently because Detective Weinstein was not shown to have had first-hand knowledge of the informant's reliability. The state appeals from the court's ruling on the objection, but the state had proferred neither Detective Weinstein's answer to the question nor testimony of the officer who originally took the informant's call. The failure to proffer what the excluded evidence would have revealed precludes appellate consideration of the alleged error in excluding the evidence. See Whitted v. State, 362 So.2d 668 (Fla. 1978); Ketrow v. State, 414 So.2d 298 (Fla. 2d DCA 1982).
The record is, therefore, devoid of any evidence not only as to the informant's identity but also as to the informant's "reliability," the first prong of the two-pronged *113 test. For that reason this case must be treated, as were the facts of Hetland, Webb, and Tippins, as a stop based upon a tip from an anonymous source (which, as pointed out above, may be a valid stop only if the information in the tip is sufficiently specific and can be corroborated). As the Florida Supreme Court said in Webb, "At the suppression hearing, there was no testimony concerning the source of the description of the robbery suspect. We assume, for purposes of disposition of this cause, that the tip was anonymous because the State did not prove otherwise." 398 So.2d at 821, n. 2. Consequently, the validity of the police stop in the case at hand must rest entirely upon the second prong, i.e., the informant's basis of knowledge, if any, for the information that the van was involved with stolen property.
A discussion of the contents of an informant's tip which did not fulfill the requirements of the second-prong is contained in Terrell v. State, 429 So.2d 778 (Fla. 3d DCA 1983). Although Terrell, which did not involve an anonymous tip situation, was also decided before Gates and thus says under pre-Gates case law that both prongs of the test must be satisfied, the Terrell discussion of the second prong remains in point. In Terrell the court, citing Aguilar, noted that the informant's tip did not satisfy the second prong because it "utterly failed to apprise the arresting officer of any `underlying circumstances from which the informant concluded that the narcotics were where he claimed them to be.'" The Terrell court continued,
The "basis of knowledge" prong ... assumes an informant's "veracity," and then proceeds to probe and test its conclusion: ("What are the raw facts upon which the informant based his conclusion?" "How did the informant obtain those facts?" "What precisely did he see or hear or smell or touch firsthand?" "If he heard the facts from someone else, what makes that third person `credible' and how did that third person come by the knowledge?").
Terrell, 429 So.2d at 779, quoting Stanley v. Smith, 19 Md. App. 507, 531, 313 A.2d 847, 861 (1974).
In the case before us the information given by the informant was only that someone in a specified house was moving stolen property in an older model, customized, blue Ford van. (I do not agree with the majority opinion's indication that that "someone" was reported to be the informant's neighbor; the record shows only that the van was reported to be at a neighbor's house; the defendant's address was different from the address of that house.) The record does not show how the informant purported to have known that the unspecified property was stolen or was being moved in the van.
In Gates, where the Supreme Court upheld the validity of a search, the informant gave specific information that the police were able to confirm prior to making the search. For example, the Gates informant told the police the names of the persons who were allegedly involved in the planned drug deal and gave the police details about past drug purchasing trips to Florida. The informant also told the police the date on which the next drug purchasing trip would begin. The police were able to verify this information as they observed the alleged drug dealers on their trip to Florida and back to Illinois and as they observed their actions while in Florida. Because the information proved to be accurate, the Supreme Court concluded the police were entitled to believe that the information had also been trustworthy in saying that the persons would be involved in unlawful activity consisting of possessing and transporting large amounts of drugs.
As Webb points out, in the Hetland case the specific details of the informant's tip describing the suspect's features and his location were corroborated "by prompt police action finding an individual in the general area of [the] named location who precisely fits the description given... ." Webb, 398 So.2d at 823. Similarly, in the Webb case, "The description of the robbery suspect, which the officers immediately *114 wrote down, was specific, and the information was corroborated when the officers acted promptly and found Webb who matched the description in the same general vicinity where the two robberies had occurred on the two previous days." 398 So.2d at 826. The Florida Supreme Court in Webb concluded that the stop of the suspect had been proper because the information bore "sufficient indicia of reliability" and "[f]acts were articulated at the suppression hearing upon which the officers founded their suspicion." 398 So.2d at 826. In Tippins the anonymous tip which was found to be "sufficiently detailed and corroborated" was that "a black male, Willie Tippins, from West Palm Beach, driving a 1970 gold and black Cadillac with a temporary tag in the window, was selling cocaine and heroin in a specified area of Daytona Beach." 454 So.2d at 631.
Whether the information from the informant in the case before us justified the stop of defendant, therefore, depends upon, under Hetland, Webb, Tippins, and Gates, whether the information contained enough corroboratable specificity to show that the informant knew unlawful activity was involved or, under Terrell, whether at least it was shown how he knew. But I am inclined to doubt that the requirements of Hetland, Webb, Tippins, and Gates for the trustworthiness of an anonymous tip would always be met if it were only shown how the informant knew of purported unlawful activity. Nor am I inclined to think that for an anonymous tip to be sufficiently trustworthy it must in all cases necessarily show how the informant knew. Nonetheless, I believe that the more it is shown how an anonymous informant knew, the less other details with corroboratable specificity should be required in the tip in order to justify police reliance upon it. In any event, in this case there was neither sufficient corroboratable specificity of details nor a showing of how the informant knew of the purported unlawful activity.
The informant in this case gave the officers only two pieces of information other than the crucial, unexplained information that there was unlawful activity because stolen property was involved: (a) property (unspecified) was being moved from a specific house and (b) the property was being transported in an older model, customized, blue Ford van. The officers were unable to corroborate the first piece of information because when they went to the house, they apparently saw no moving of property or any other indication that such activity was taking place. Nor did they see such a van at that location.
Thus, the officers were left with only a part of the second piece of information  the general description of the vehicle  as a possible basis for concluding that the information that stolen property was involved was trustworthy. As indicated above, I am not questioning that such a general description might have been sufficient to support the trustworthiness of the informant's tip if the officers had actually seen property being loaded into the van, had seen a van of that description at the specified house, or even had seen the van on the street coming from the house. In any of those situations there would have been corroboration of a part of the informant's information which may have been sufficient to support the assumption that the information was also trustworthy in saying that stolen property was involved. However, those are not the facts of this case.
Under the facts of this case, the issue is whether it was proper for the officers to assume the trustworthiness of the informant's tip about stolen property simply based upon the fact that the officers saw an older model, customized, blue Ford van pulling into a convenience store parking lot some one-half mile away from the specified house, presumably a substantial time after the informant said he saw such a van at the house. As discussed above under the first question, I believe we cannot conclude that the trial judge was incorrect in finding, in light of the generalized description of the van and the lack of any description of its occupants, that the officers could not be sufficiently sure that the van they saw was the one referred to by the informant. But, more to the point under a Hetland, Webb, *115 Tippins and Gates analysis, I do not believe that the sighting of a van matching the general description some distance away from the place described by the informant and some time later corroborated the informant's otherwise unsubstantiated information that property was stolen; at the least the record does not show the existence of any such corroboration sufficient to support a reversal of the trial judge's suppression order. In contrast to those four cases, the other information which had been given by the informant here was not independently substantiated by police observation and therefore provided no proper basis for assuming the trustworthiness of the crucial part of the information  that stolen property was involved. There was not even any showing of how the informant purported to know, i.e., that the informant purported to speak from any personal knowledge as to property being stolen and was not simply saying what he had heard from others or, if he had heard it from others, what their basis for the information was  or if the basis was simply "casual rumor." Spinelli, 393 U.S. at 416, 89 S.Ct. at 589, 21 L.Ed.2d at 644. The report that stolen property was involved was shown to be no more than a conclusion by the informant. Gates teaches that "bare conclusions of others" are inadequate to establish the trustworthiness of the information. 462 U.S. at 239, 103 S.Ct. at 2332, 76 L.Ed.2d at 549.
In fact, as indicated above, when the van was stopped by the officers it did not contain property meeting the description of stolen property (meat) the record shows the officers were looking for. Therefore, if the record shows that anything was indicated from the van as to the trustworthiness of the informant's tip, it could be said to be untrustworthiness. In any event, I conclude that at best from the standpoint of the prosecution the requirement of Gates has not been met that a "strong" showing of the second prong of the test must exist to compensate for an absolute lack of evidence as to the first prong.
Especially in the absence in this case of corroborated details like those in Hetland, Webb, Tippins, and Gates, my conclusion is much like that in Terrell where the Third District said that the requirements of the second prong had not been met:
[T]he arresting officer gave no testimony from which the conclusion could have been drawn that the informant himself had seen the activities about which he spoke, or that although not personally observing these activities, the informant had learned of them from a credible and reliable source... . From all that appears, the informant here merely suspected, believed or concluded that there were narcotics in Terrell's possession. As in so many like cases, the failure to satisfy this "basis of knowledge" prong .. . renders the defendant's arrest and search incident thereto unlawful. (Citations of fourteen cases omitted.)
429 So.2d at 779.
I believe the majority opinion, by not more specifically addressing the second question discussed in this dissent, has not dealt with a clear alternative ground for the trial court to have granted the motion to suppress which requires our affirmance. The Terry principle referred to in the majority opinion that a police stop may be justified if based upon "specific and articulable facts which ... reasonably warrant that intrusion" is, of course, the law but does not fully state the law applicable to a stop based solely upon an informant's tip. Terry involved a situation where the relevant facts indicating criminal activity were observed by the officer. That was not the situation in this case which is governed not only by the Terry principle as to an officer's reasonable suspicions but also by the second prong of the two-pronged test in Gates for stops based solely upon information received by the police from an anonymous informant.
This relationship between Terry and Gates in a case like this is shown in Tippins, 454 So.2d at 631, where the Fifth District pointed out that "to justify at least reasonable suspicion for [a temporary] detention under Terry, if not probable cause *116 [to arrest]" when the detention is based solely upon information from an anonymous informant, the information must be "sufficiently detailed and corroborated under Illinois v. Gates ... and Hetland v. State... ."
Possibly the majority opinion's reference to Terry was meant to represent the view that Gates should only apply to arrests or warrants, for which "probable cause" is necessary, whereas a stop merely requires a reasonable suspicion of illegal activity under Terry. However, in both Hetland and Webb, which involved stops and gave substantial attention to Terry, the analyses of the requisites of indicia of trustworthiness and corroboratability of anonymous tips in order to justify stops based upon those types of tips are virtually the same as the analysis of those aspects in Gates as to a warrant. For example, Hetland stresses, with regard to the validity of a stop, "indicia of reliability" from "the specificity of the information given" when "the information is corroborated." 366 So.2d at 839. This is absolutely parallel to the Supreme Court's analysis in Gates, as well as to the Supreme Court's prior analyses in Aguilar and Spinelli. See also Adams v. Williams, which is discussed in Hetland and required "indicia of reliability" of an informant's tip to justify a stop based upon the tip. It cannot be argued with any validity that Gates established any more rigorous standards to validate an anonymous informant's tip than did Hetland. See again Tippins, 454 So.2d at 631, which, as is pointed out above, cites both Gates and Hetland as authority for the requirement of specificity and corroboratability to justify a temporary detention.
Along similar lines, it might possibly be argued that the majority opinion's reversal is based upon the plain premise that Terry authorized the stop in this case because the officers were entitled to have had a reasonable suspicion of illegal activity from the informant's tip, regardless of any indicia of reliability of the informant (the first prong of the two-pronged test) or any specificity or corroboratability of the information (the second prong). However, that argument would stand for nothing less than the supposition that a police officer can rely upon any informant's tip to make a "mere" stop. Presumably the rationale would be that the officer should not be expected to not make the stop and risk the possibility of letting a criminal go free if the tip should turn out to be valid. In other words, as the question had been posed by the state in Hetland with reference to an officer who wants to do his duty, "In a situation like this, what is a policeman to do? ... Must he ignore the information given?" 366 So.2d at 833. Hetland answers those questions by saying, "we specifically do not hold ... that a stop based on an anonymous tip is valid in all cases," 366 So.2d at 838, and sets out the requirements of specificity and corroboratability of the information in an anonymous tip. Pre-Hetland Florida law was to the effect that no anonymous tip by itself had sufficient credibility to provide the basis for a valid stop. Hetland, 366 So.2d at 832, citing State v. Hendry, 309 So.2d 61 (Fla. 2d DCA 1975). That law was changed by Hetland only to the extent that such a tip has sufficient specificity and corroboratability.
If, as is the law from Hetland, Webb, Tippins, and Gates, just any anonymous tip as to unlawful activity cannot be considered trustworthy enough to justify police action against a suspect in reliance upon the tip, what then could there be to support the trustworthiness of such a tip except for the specificity and corroboratability requirements of those cases?
Whitley v. State, 349 So.2d 840 (Fla. 2d DCA 1977), a pre-Gates case cited in the majority opinion for the same principle as that in Terry, is, I believe, substantial authority supporting the view of this dissent that the suppression of the evidence in this case should be affirmed. Whitley reversed a trial court's order denying a motion to suppress evidence which had been obtained following a stop of an automobile based upon the officer's observation of the automobile which he apparently knew had been used by someone else two weeks previously in a drug transaction. The basis for this *117 court's reversal in Whitley was very similar to the basis of this dissent. In that case, as in this case, the officer had not observed any facts indicating unlawful activity of defendant involving the vehicle. Also, in that case, as in this case, an objection had been sustained by the trial court on a hearsay basis to a question to the officer as to what he had been told by confidential informants to support the stop. Since the state had made no proffer of what the officer would have said about the confidential informants, the ruling on the objection had not been preserved for appellate review and there was no consideration of any such justification for the stop. Thus, Whitley, as does the case at hand, involved a stop which was apparently based solely upon information from an informant which was not shown to be trustworthy. The stop in Whitley which this court concluded was unlawful was not supported by either the first or second prong of the two-pronged Gates test which, in my view, was the situation in the case at hand.
Additionally, I do not think that State v. Lewis, 406 So.2d 79 (Fla. 2d DCA 1981), also cited in the majority opinion, is dispositive. That case involved a stop based upon police observation of suspicious activity; it did not involve the situation here  a stop based upon a tip from an informant. Lewis v. State, 337 So.2d 1031 (Fla. 2d DCA 1976), which is also cited in the majority opinion, is, as pointed out in the discussion in this dissent of the first question involved in this appeal, supportive of the trial court's ruling that the description of the van in this case was not specific enough. But I believe that case also supports an affirmance on the basis of the second question dealt with in this dissent: the principal basis for this court's reversal in Lewis v. State of an order denying a motion to suppress evidence obtained from a stop of an automobile was that the stop was based upon an anonymous tip, as was in effect the stop in this case, and had no indicia of trustworthiness.
Even though Officer Belcher was acting upon a radio dispatch, we must still look to the source of that dispatch and determine its reliability. Whiteley v. Warden, 1971, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306. Here the source of the dispatch was merely an "anonymous citizen." There is no contention that the tip was bolstered by any other reports or observations.
Lewis v. State, 337 So.2d at 1032.
Watts v. State, 468 So.2d 256 (Fla. 2d DCA 1985), another case cited in the majority opinion, also does not appear to be dispositive because it simply involved a stop of a robbery suspect whose description did not match the description of the robber which had been given to the police. Watts does, however, state the principle which is quoted from Hetland in this dissent's discussion of the first question involved in this appeal  that "[a] vague description simply will not justify a law enforcement officer in stopping every individual ... which might possibly meet that description." 468 So.2d at 257.