366 So.2d 831 (1979)
STATE of Florida, Appellant,
v.
Robert Leslie HETLAND, Jr., Appellee.
No. 78-165.
District Court of Appeal of Florida, Second District.
January 24, 1979.
*832 Robert L. Shevin, Atty. Gen., Tallahassee, and William I. Munsey, Jr., Asst. Atty. Gen., Tampa, for appellant.
Robert E. Jagger, Public Defender, and Ellen Irene Hoffenberg, Asst. Public Defender, Clearwater, for appellee.
DANAHY, Judge.
Can an anonymous tip provide the basis for a valid stop and frisk? That question was answered in the negative by this court in State v. Hendry, 309 So.2d 61 (Fla.2d DCA 1975). In the Hendry case, law enforcement officers received information from an unidentified passing motorist that some people in an automobile in Old Bridge Square had marijuana in their possession. A description of the car and the license tag number was given. A short time later law enforcement officers located a vehicle in Old Bridge Square matching the description which had been given. When the officers approached the vehicle, the defendant and other individuals got out of the vehicle and walked toward the officers. The officers advised them that they were to be detained because they were suspected of being in possession of marijuana. We disapproved that detention.
The facts in the instant case prompted us to re-examine our position in Hendry. We have concluded that a stop should not be found invalid solely because it is based on information received from an anonymous informant. Therefore, we recede from the decision in Hendry. We hold that the stop in the case before us was proper.
*833 Pinellas County sheriff's deputies McClarren and Beymer were informed by their dispatcher via car radio that an anonymous phone call from an unknown female had been received, advising that a man named Robert Hetland was on his way to Cherry's Bar to shoot someone. The anonymous caller described Hetland as a white male, six feet tall, with dirty shoulderlength blonde hair, full beard and mustache, wearing a tank shirt, denim pants and a blue denim jacket. He was said to be carrying a silver revolver with a black handle.
The deputies proceeded at once to Cherry's Bar and entered. There was no commotion; all was quiet. Appellee was the only person sitting at the bar and there was nothing in his manner or actions which was suspicious. His appearance, however, was identical to the description which had been given by the anonymous informant.
Deputy McClarren approached appellee and asked him his name. He responded that his name was Robert Hetland. Deputy McClarren then asked appellee to stand up. As appellee proceeded to do so, Deputy McClarren saw the butt of a gun protruding from appellee's waistband just above the belt buckle. McClarren then asked appellee to place his hands on the bar, which he did. Thereupon, McClarren reached under appellee's shirt and removed a nickel plated revolver with five live rounds, wrapped in a brown paper towel. Appellee was promptly placed under arrest for carrying a concealed firearm.
Appellee moved to suppress the revolver as evidence against him on the ground that it was obtained from him by an unlawful search and seizure, in violation of the Florida Stop and Frisk Law[1] and in contravention of appellee's constitutional rights. Understandably, in view of our decision in Hendry, the trial judge granted the motion to suppress. The state appealed, urging that this court follow the recent decision of the Third District Court of Appeal in State v. Francois, 355 So.2d 127 (Fla.3d DCA 1978).
In Francois, an unidentified individual told a police officer that a man inside a nearby bar was threatening to kill someone. The officer entered the bar, where the defendant was pointed out to him as the person making the threat. The officer asked the defendant to step outside the bar and then requested identification. During the questioning, the officer noticed a bulge on the defendant's leg. The officer reached down and removed a revolver. He then arrested the defendant for carrying a concealed firearm. The trial court suppressed the revolver as evidence on the ground that the search and seizure were unreasonable. The Third District Court of Appeal reversed. We agree with that decision insofar as the propriety of the stop is concerned.[2]
In the instant case, the state put to us the question: "In a situation like this, what is a policeman supposed to do? He has information that a violent crime may take place which will result in serious injury or death. A response less than a stop and frisk would be no response at all. Must he ignore the information given?" Struck by that question, we determined to re-examine the issue. Our initial thought was that the decision in Hendry should simply not be extended to a situation in which the anonymous tip concerns the possession of a firearm. It seemed to us that a stop and frisk in such a situation, though based on an anonymous tip, might be justified by the danger posed by persons carrying concealed firearms. Our research was undertaken to determine whether there is authority supporting such a conclusion. We have found authority for the proposition that an anonymous tip can provide the basis for a valid stop not only where the criminal activity involved is dangerous to public safety, but also in other situations where the criminal activity is less *834 threatening, such as in the case of a possessory offense.
"Stop and frisk" are words of art which first acquired meaning nonjudicially in the development of law enforcement procedures. In law enforcement parlance, a "stop" meant a temporary investigative detention of an individual short of arrest. A "frisk" meant the pat-down of an individual's outer clothing to determine whether he was carrying a weapon, a procedure not amounting to a complete search. As a matter of constitutional law, the validity of the initial stop is crucial in determining whether evidence seized as a result of the stop is admissible in a subsequent prosecution of the person stopped. Such evidence may be obtained as the result of a frisk following the stop, or as the result of the officer's observation upon making the stop, as in the instant case. Either circumstance may provide probable cause for an arrest followed by a search, or a search followed by arrest. Evidence may be seized as a result of such an ensuing search. Again, the admissibility of that evidence depends on the validity of the initial stop.
In 1967 the Court of Appeals of New York approved a stop and the seizure of a gun under circumstances very similar to those in the case now before us, based upon a New York "stop and frisk" law which that court had previously found constitutional. People v. Taggart, 20 N.Y.2d 335, 283 N.Y.S.2d 1, 229 N.E.2d 581 (1967). An appeal in that case to the United States Supreme Court was dismissed because the notice of appeal was not timely filed. Taggart v. People, 392 U.S. 667, 88 S.Ct. 2317, 20 L.Ed.2d 1360 (1968).
In another case in 1968, however, the United States Supreme Court had occasion to consider and sanction the "stop and frisk" concept. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The court ruled in Terry that, without a warrant and without probable cause to arrest or search, a law enforcement officer may nevertheless, under proper circumstances, forcefully restrain an individual's freedom to leave (a stop) and may conduct a protective search for weapons (a frisk). The Court held that a stop and frisk is not per se an unreasonable search and seizure forbidden by the Fourth Amendment to the United States Constitution.[3] The basic Terry principle is that a stop is permissible if based on a reasonable suspicion that criminal activity is afoot, and a frisk of the person stopped is permissible if the officer has reason to believe that the person stopped is armed and dangerous. Thus, under Terry, a frisk following a stop is not automatically permissible. The validity of a stop and the validity of a frisk are assessed separately, but a frisk can never be upheld if the initial stop was improper.
We pause to note that there was not actually a frisk of appellee Hetland in this case, although we feel confident that Deputy McClarren intended to conduct a frisk; it so happened, however, that he observed the gun in appellee's waistband rather than discovering it in the course of a frisk. Our focus in this case is on the question whether the stop was valid and we believe it was. For future application of our holding here, we feel it appropriate to observe that for the same reason the stop was valid, a frisk would have been justified.
Our conclusion in this case was reached after a careful study of the development in the courts of the principle expressed by the Supreme Court in Terry. Therefore, a summary of the subsequent history of Terry will explain the basis for our decision. We have also, of course, considered the effect of Florida law.
Following the decision in Terry, one writer raised the question whether an anonymous tip could be the basis for a valid stop and frisk.[4] Referring to and approving the *835 decision in People v. Taggart, supra, he suggested that action on the basis of anonymous information should be allowed only in cases involving the risk of serious personal injury or grave irreparable property damage and should not be undertaken for the enforcement of sumptuary laws, such as gambling, and laws of limited public consequence, such as narcotics violations.[5] Under that reasoning, the reasonableness of a stop would be measured at least in part by the nature of the criminal activity involved. But as developed by the United States Supreme Court and other courts, the validity of a stop has not been measured in terms of the nature of the criminal activity involved, but rather on the information and circumstances known to the law enforcement officer.
The Terry case involved the personal observation by a law enforcement officer of conduct indicating that a crime of violence (armed robbery) was about to be committed. An early question, then, was whether a constitutionally valid stop was limited to situations in which a police officer personally observes suspicious conduct and the suspected criminal activity is threatening to public safety.
In its later decision in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Supreme Court made it clear that the Terry principle was not to be so restricted. In Adams, the court upheld the validity of a stop prompted by a tip from a known informant alleging that a man in a nearby parked car possessed narcotics and carried a gun at his waist. The Court expressly stated that the circumstances justifying a valid stop need not be based on an officer's personal observation. On the contrary, it held that the information received by the officer carried enough indicia of reliability to justify the stop.
In 1969, after the decision in Terry, but before the decision in Adams, the Florida legislature enacted the Florida Stop and Frisk Law.[6] That law sets forth circumstances under which a law enforcement officer of this state may temporarily detain a person and, additionally, make a limited search of a person so detained for the purpose of disclosing the presence of a weapon. The wording of the law clearly implies that the circumstances giving rise to a stop must *836 be personally observed by the officer. We disapproved the stop in Hendry because there were no suspicious circumstances observable to the officers in that case; their only information was that given by the anonymous informant.
Therefore, it is necessary to determine what standard is to be used to measure the validity of a stop in Florida. Is it to be the standard of constitutionality under the Fourth Amendment to the United States Constitution, as expressed in Terry and its progeny, or is it to be the standard as set forth in the Florida Stop and Frisk Law? Before answering that question, we should at least consider whether a higher or different standard is imposed by the prohibition against unreasonable searches and seizures in the Florida Constitution.
The prohibition against unreasonable searches and seizures in the Florida Constitution[7] has appeared in all our constitutions in basically the same language. In an early case our supreme court noted that the provision has the same meaning and uses almost identically the same language as the Fourth Amendment to the Federal Constitution.[8]Thurman v. State, 116 Fla. 426, 156 So. 484 (1934). In assessing the validity under the Florida Constitution of the search and seizure involved in that case, the court referred to decisions of the United States Supreme Court construing the Fourth Amendment. At that time, it had not yet been held that the Fourth Amendment applies to the states under the Fourteenth Amendment.[9] In Houston v. State, 113 So.2d 582 (Fla. 1st DCA 1959) it was observed that rulings of United States courts on reasonable searches were generally accepted as authority for similar rulings in Florida under the Florida Constitution. We have no difficulty in concluding that the search and seizure provision of the Florida Constitution imposes no higher standard than that of the Fourth Amendment to the United States Constitution.
We now hold that the Florida Stop and Frisk Law was not intended to, and does not, impose any higher standard than that of the Fourth Amendment.[10] This being so, it is of little consequence whether a particular stop is within the parameters set forth in the Florida Stop and Frisk Law. Assuming that it were, the question would remain whether the stop was constitutional. And if it were not within the parameters of the statute, the *837 stop would nevertheless be valid if constitutionally permissible. Just as a stop authorized by a state law may be unreasonable under the Fourth Amendment, so may a stop not expressly authorized by state law be justified as a constitutionally reasonable one. Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).
Our inquiry, then, has been directed solely to the question whether the stop involved in the instant case meets the requirements of the Fourth Amendment to the United States Constitution as expressed in Terry v. Ohio, supra, Adams v. Williams, supra, and cases following those decisions.
In its opinion in Adams, the Supreme Court noted that the informant was known personally to the officer and had provided him with information in the past. The Court remarked that "[t]his is a stronger case than obtains in the case of an anonymous telephone tip." The last quoted sentence has caused particular difficulty to courts considering the validity of a stop based on an anonymous tip. Indeed, it was apparently influential in the decision reached by this court in Hendry.
But prior to the decision in Adams, there had been significant developments in lower federal courts in situations involving stops based on anonymous tips. In Ballou v. Commonwealth, 403 F.2d 982 (1st Cir.1968), an unidentified informant called police headquarters and advised that certain named individuals were at a cafe and that they all had guns. One of the named individuals had been imprisoned on a gun carrying charge and another one was known to carry a gun. Police officers located the cafe, found the named individuals there, stopped them, and conducted a limited frisk for weapons. One of the individuals was found to be carrying a concealed revolver and was prosecuted for that offense. The state trial court denied his motion to suppress the revolver as evidence and that denial was affirmed on appeal. Commonwealth v. Ballou, 350 Mass. 751, 217 N.E.2d 187 (1966), cert. denied, 385 U.S. 1031, 87 S.Ct. 760, 17 L.Ed.2d 679 (1967). In a habeas corpus proceeding, the United States Court of Appeals held that the stop and frisk was proper, basing its reasoning on the holding in Terry. Again, the United States Supreme Court denied certiorari. Ballou v. Commonwealth, 394 U.S. 909, 89 S.Ct. 1024, 22 L.Ed.2d 222 (1969).
A few months later the United States Court of Appeals for the Eighth Circuit upheld a stop and frisk based on an anonymous tip. United States v. Unverzagt, 424 F.2d 396 (8th Cir.1970). In that case the United States postal inspectors received a telephone call from a person who gave a name but was unknown to them and never located. This person informed the inspectors that a named individual was attempting to sell postal money orders in a particular bar. He was described as 5'7" to 5'9" in height, weighing 150 to 160 pounds, with a fresh scar on his forehead. Acting on the basis of that information, the inspectors proceeded to the named bar, and were told by the bartender that a person meeting the description given was in the men's washroom and that the bartender thought the man had a gun. The inspectors then ordered the suspect to come out of the washroom and raise his hands. When he did so he revealed a revolver, which was taken from him. He was then placed against the wall and searched. As a result of that search, the inspectors seized a quantity of postal money orders. The individual was then tried and convicted on the charge of receiving, concealing, and retaining stolen money orders. He filed a motion to suppress the use of the money orders as evidence on the ground that they were seized in violation of his rights under the Fourth Amendment. That motion was overruled and, on appeal, the Court of Appeals affirmed.
In its opinion in Adams, decided two years following United States v. Unverzagt, the United States Supreme Court cited the decision in that case with approval.[11] It is *838 this little noted aspect of the opinion in Adams which first caused us to reconsider the result reached in Hendry.
Our research reveals that, since Adams, five more United States Courts of Appeals have had occasion to consider the propriety of investigatory police action based on information received from an anonymous source. In each case the action of the law enforcement officers was approved. United States v. Preston, 468 F.2d 1007 (6th Cir.1972) (guns); United States v. Hernandez, 486 F.2d 614 (7th Cir.1973), cert. denied, 415 U.S. 959, 94 S.Ct. 1488, 39 L.Ed.2d 574 (1974) (unlawful transportation of aliens); United States v. Legato, 480 F.2d 408 (5th Cir.1973), cert. denied, 414 U.S. 979, 94 S.Ct. 295, 38 L.Ed.2d 223 (1973) (bomb at an airport); United States v. Cage, 494 F.2d 740 (10th Cir.1973) (gun); United States v. Gorin, 564 F.2d 159 (4th Cir.1977), cert. denied, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978) (gun). But cf. United States v. Robinson, 536 F.2d 1298 (9th Cir.1976) (stop based on police dispatch invalid where source of dispatch unknown).
As best we can determine, since the decision in Adams, the appellate court of the District of Columbia and appellate courts in eleven states other than Florida have considered the validity of stops based on information from anonymous sources. In ten cases, such stops were found to be valid. (These include decisions in New York and Massachusetts in accord with their earlier opinions in cases we have previously mentioned). United States v. Walker, 294 A.2d 376 (D.C. 1972), cert. denied, 414 U.S. 1007, 94 S.Ct. 368, 38 L.Ed.2d 245 (1973) (gun); People v. Jeffries, 39 Mich. App. 506, 197 N.W.2d 903 (1972) (gun); State v. Chatmon, 9 Wash. App. 741, 515 P.2d 530 (1973) (drugs); State v. Hobson, 95 Idaho 920, 523 P.2d 523 (1974) (drugs); Commonwealth v. Anderson, 366 Mass. 394, 318 N.E.2d 834 (1974) (gun and drugs); People v. Lopez, 52 Cal. App.3d 263, 123 Cal. Rptr. 855 (1974) (drugs); People v. McElroy, 44 Ill. App.3d 1047, 3 Ill.Dec. 495, 358 N.E.2d 1180 (1976) (gun); State in the Interest of H.B., 75 N.J. 243, 381 A.2d 759 (1977) (gun); People v. Kinlock, 43 N.Y.2d 832, 402 N.Y.S.2d 573, 373 N.E.2d 372 (1977) (gun); People v. Tooks, 403 Mich. 568, 271 N.W.2d 503 (1978) (gun).
Two state courts have disapproved stops based on anonymous tips. Jackson v. State, 157 Ind. App. 662, 301 N.E.2d 370 (1973); Commonwealth v. Anderson, Pa., 392 A.2d 1298 (1978). We note that in both cases the information given was vague. Indeed, the Pennsylvania court seemed to reach its conclusion because of the general nature of the description, which it noted could fit any number of individuals.
Two state decisions have disapproved stops based on information received from a police dispatcher, the source of which could not be traced. State v. Benson, 198 Neb. 14, 251 N.W.2d 659 (1977), cert. denied, 434 U.S. 833, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977); Price v. State, 37 Md. App. 248, 376 A.2d 1158 (1977). We note that the Fourth District Court of Appeal has recently so held, citing our decision in Hendry. St. John v. State, 363 So.2d 862 (Fla. 4th DCA 1978).
We are impressed by the number of jurisdictions, both state and federal, which have approved stops based on information received from anonymous sources. We consider such decisions persuasive in view of the fact that the United States Supreme Court has not addressed the issue since the decision in Adams. On the contrary, the Court declined to review several of the cases which we have cited.
Most significantly of all, however, is the fact that Adams cited with approval a case upholding a stop based on information from an anonymous telephone tip, where the criminal activity involved was not violent in nature. Although the tipster in that case gave a name, he was unknown and never located.
We, therefore, hold that an anonymous tip can provide the basis for a valid stop. We specifically do not hold, however, that a stop based on an anonymous tip is valid in all cases. In Adams v. Williams, the Supreme Court found that the information given by the known informant in that case carried enough indicia of reliability to justify *839 the stop. Our holding here is that such indicia of reliability can attach to an anonymous tip. Therefore, the fact alone that information is received from an anonymous source does not in and of itself invalidate a stop based on that information.
What are the indicia of reliability which can be found in an anonymous tip? We believe that one such indicium is the specificity of the information given, as in the instant case. Such detail carries a strong indication that the information is based on the personal observation of the informant. Moreover, the information is corroborated when officers act promptly and find an individual in the named location who exactly fits the description, as in this case.
We find that the anonymous tip concerning appellee Hetland justified the action taken by Deputies McClarren and Beymer. Therefore, we hold that the stop of appellee Hetland in this case was valid. Accordingly, when Deputy McClarren observed the butt of a gun protruding from appellee's waistband, his seizure of that gun was valid. We reverse the order of the trial court granting appellee's motion to suppress.
Some further remarks are appropriate. In its Adams opinion, the Supreme Court observed that "[i]nformants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation." In our view, a vague description simply would not justify a law enforcement officer in stopping every individual who, or every vehicle which, might possibly meet that description. In Lewis v. State, 337 So.2d 1031 (Fla.2d DCA 1976) this court disapproved a stop based on information describing only a red Volkswagen carrying two white males who were selling drugs, where a car meeting that description was stopped a considerable distance from the scene of the alleged drug sale. We believe that result was correct. Similarly, the United States Court of Appeals for the Fifth Circuit recently found an anonymous tip insufficient to support a stop where the few facts provided did not reasonably suggest personal knowledge on the part of the informant and thus did not justify the belief that the informant was "relying on something more substantial than a casual rumor." United States v. McLeroy, 584 F.2d 746 (5th Cir.1978).
As a matter of caution, we make two further points. First, the anonymous tip's vulnerability to attack, and resulting litigation, emphasizes the need for law enforcement personnel to record the identity of an informant whenever possible. Information given on the street, of course, may require such quick action that no time is available for recording the informant's name and address, but whenever practicable under the circumstances, that information should be obtained and noted. This will enable the officer to later locate and identify the person who gave the information and thereby go far to remove from subsequent prosecutions the troublesome factor of anonymity. United States v. Frye, 271 A.2d 788 (D.C. 1970).
Second, a verbatim record of the information given is the best way to support the position that a tip bore indicia of reliability despite the anonymity of the informer. Our opinion in this case shows the importance of the details given. Only an officer on the street whose need for immediate action leaves no time for making notes is justified in relying solely on his memory to report what his informant said. A contemporaneous record of every tip relayed by telephone should be standard procedure in every law enforcement office.
We mention these matters not to diminish the impact of our decision in this case, but to suggest procedures which will lighten the burden of troubling questions for both law enforcement personnel and the courts.
Reversed and remanded for further proceedings not inconsistent with this opinion.
SCHEB, Acting C.J., and OTT, J., concur.
NOTES
[1] § 901.151, Fla. Stat. (1977).
[2] It seems to us that unless the bulge obviously indicated that it was caused by the presence of a weapon (which may have been the case), the officer should have first conducted a pat-down. The opinion makes it unclear whether he did so.
[3] Evidence obtained by a search and seizure in violation of the Fourth Amendment is inadmissible in state courts under the due process clause of the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).
[4] LaFave, "Street Encounters" and the Constitution: Terry, Sibron, Peters, and Beyond, 67 Mich.L.Rev. 40 (1968).
[5] Id. at 78.
[6] § 901.151, Fla. Stat. (1977). The statute, which has not been amended since its enactment, reads as follows:

901.151 Stop and Frisk Law. 
(1) This section may be known and cited as the "Florida stop and frisk law."
(2) Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county, he may temporarily detain such person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding his presence abroad which led the officer to believe that he had committed, was committing, or was about to commit a criminal offense.
(3) No person shall be temporarily detained under the provisions of subsection (2) longer than is reasonably necessary to effect the purposes of that subsection. Such temporary detention shall not extend beyond the place where it was first effected or the immediate vicinity thereof.
(4) If at any time after the onset of the temporary detention authorized by subsection (2), probable cause for arrest of person shall appear, the person shall be arrested. If, after an inquiry into the circumstances which prompted the temporary detention, no probable cause for the arrest of the person shall appear, he shall be released.
(5) Whenever any law enforcement officer authorized to detain temporarily any person under the provisions of subsection (2) has probable cause to believe that any person whom he has temporarily detained, or is about to detain temporarily, is armed with a dangerous weapon and therefore offers a threat to the safety of the officer or any other person, he may search such person so temporarily detained only to the extent necessary to disclose, and for the purpose of disclosing, the presence of such weapon. If such a search discloses such a weapon or any evidence of a criminal offense it may be seized.
(6) No evidence seized by a law enforcement officer in any search under this section shall be admissible against any person in any court of this state or political subdivision thereof unless the search which disclosed its existence was authorized by and conducted in compliance with the provisions of subsections (2)-(5).
[7] Art. 1, § 12, Fla. Const. provides:

Searches and seizures.  The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated. No warrant shall be issued except upon probable cause, supported by affidavit, particularly describing the place or places to be searched, the person or persons, thing or things to be seized, the communication to be intercepted, and the nature of evidence to be obtained. Articles or information obtained in violation of this right shall not be admissible in evidence.
[8] The Fourth Amendment reads as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
[9] Mapp v. Ohio, supra, note 3.
[10] The statute apparently was intended to do no more than announce the Terry decision as the law in Florida. An explanation of the statute prepared by the Florida Legislative Service Bureau pointed out that authority for an investigative stop and frisk already existed under case law:

Senate Bill 125, Chapter 69-73, reiterates the circumstances under which a law enforcement officer may reasonably temporarily detain a person suspected of breaking the law or about to break the law as enunciated in the case of Terry v. State of Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and is given the short title "Florida Stop and Frisk Law." While this statute does nothing more than set forth the circumstances under which a reasonable stopping, detaining and searching of a suspect may be carried out by a law enforcement officer as they now exist under case law, it will serve as a guideline to better inform lawmen how to successfully start a preliminary investigation into a crime that is being committed or is about to be committed. This act is effective October 1, 1969. Florida Legislative Service Bureau, 1969 Digest of General Legislation (July 1969).
[11] 407 U.S. at 146, 92 S.Ct. at 1923, 32 L.Ed.2d at 617.