727 So.2d 204 (1998)
J.L., a juvenile, Petitioner,
v.
STATE of Florida, Respondent.
No. 90,361.
Supreme Court of Florida.
December 17, 1998.
Rehearing Denied March 9, 1999.
*205 Bennett H. Brummer, Public Defender, and Harvey J. Sepler, Assistant Public Defender, Eleventh Judicial Circuit, Miami, Florida, for Petitioner.
Robert A. Butterworth, Attorney General, and Roberta G. Mandel and Mark Rosenblatt, Assistant Attorneys General, Miami, Florida, for Respondent.
PER CURIAM.
We have for review State v. J.L., 689 So.2d 1116 (Fla. 3d DCA 1997), which expressly and directly conflicts with Butts v. State, 644 So.2d 605 (Fla. 1st DCA 1994). We have jurisdiction pursuant to article V, section 3(b)(3) of the Florida Constitution. For the reasons expressed below, we decline the State's invitation to create a firearm or weapons exception[1] to the limitations on searches and seizures set out in the Fourth Amendment to the United States Constitution and the parallel provisions of the Florida Constitution.
The facts and issues in this case and Butts are similar in nature. Both cases involve an anonymous telephone tip and the issue of whether the police possessed the necessary reasonable grounds to stop and frisk a citizen based solely upon the anonymous tip.
In this case, the police received an anonymous tip stating that several young black males were standing at a specified bus stop during the daylight hours. The anonymous informant stated only that one of the individuals, the one wearing the "plaid-looking" shirt, was carrying a gun. Two police officers arrived at the specified bus stop approximately six minutes after receiving the anonymous tip and observed three black males, one of whom was wearing a plaid shirt. The three males were engaged in no suspicious or illegal conduct and no additional suspicious circumstances were observed by the officers. One of the officers immediately accosted J.L., who was wearing a plaid shirt, and ordered him to put his hands above his head. Then, without questioning or other introduction, the officer proceeded to frisk J.L. and seized a gun from J.L.'s left pocket. At the same time, the second officer, again without discussion, frisked the other two individuals. At trial, J.L.'s motion to suppress the gun was granted. On appeal, the Third District Court of Appeal reversed and held that the police had a reasonable suspicion that J.L. was carrying a concealed weapon. See J.L., 689 So.2d at 1117. The district court reasoned that the investigatory stop and frisk was justified because the surrounding circumstances indicated to the officers that the anonymous tip was reliable. See id.
In Butts, the police received an anonymous tip describing the appearance and location of a man on a bicycle who was said to be carrying a concealed gun and possibly selling drugs. The officers responded to the tip and observed Butts, who matched the description provided by the informant, riding a bicycle in the location described by the informant. The officers stopped Butts after a brief chase and detained him. The officers observed a gun in Butts' pocket and seized it. The officers frisked Butts and seized packets of cocaine and heroin. At trial, Butts' motion to suppress the gun and drugs was denied. On *206 appeal, the First District Court of Appeal held that the anonymous tip was not sufficiently reliable because it lacked specificity and the officers failed to independently corroborate significant aspects of the tip. See Butts v. State, 644 So.2d at 606. Specifically, the district court found that the tip failed to provide predictions regarding Butts' future movements or activities and that the police officers only verified the innocent and nonincriminating details of the tip. See id. In addition to the First District in Butts, the Fourth District has held that verification of an anonymous tip, by itself, is insufficient to justify a stop and frisk. See Pinkney v. State, 666 So.2d 590 (Fla. 4th DCA 1996).
In this case, J.L. asserts that the police officers did not have the requisite reasonable suspicion to justify a stop and frisk and that consequently the seizure of the firearm was unconstitutional. J.L. notes that the anonymous tip included no predictive qualities and that the officers only verified the innocent details of the tip.
We begin our analysis by noting that one of the cornerstones of this nation's foundation is the constitutional protection that individuals have a right to be free from unreasonable searches and seizures. See U.S. Const. amend. IV. The decision of the district court in J.L. seriously infringes upon this defining right.
The law is well established that a police officer may, in appropriate circumstances, stop a person for the purpose of investigating possible criminal behavior, even though there is no probable cause for an arrest, as long as the officer has reasonable suspicion that the person is engaged in criminal activity. See Terry v. Ohio, 392 U.S. 1, 19-23, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The circumstances may even require a frisk of the person to determine whether the person is carrying a weapon, if the police officer has a reasonable suspicion that the person is armed and poses a threat to the officer or others. See id. at 27, 88 S.Ct. 1868. However, when the police act on the information of an informant, the reliability of that information must be established before a citizen can be stopped and frisked.
Anonymous tips are generally less reliable than tips provided by known informants who have previously provided information to the police in the past, see Adams v. Williams, 407 U.S. 143, 146-47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), or face-to-face informants, see United States v. Salazar, 945 F.2d 47, 50-51 (2d Cir.1991). Tips from known reliable informants, such as an identifiable citizen who observes criminal conduct and reports it, along with his own identity to the police, will almost invariably be found sufficient to justify police action. In contrast, anonymous tips must be closely scrutinized. "[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations and given that the veracity of persons supplying anonymous tips is `by hypothesis largely unknown, and unknowable.'" Alabama v. White, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (quoting Illinois v. Gates, 462 U.S. 213, 237, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).
However, an anonymous tip can provide the basis for reasonable suspicion, provided that it can be established that the tip is reliable. See White, 496 U.S. at 332, 110 S.Ct. 2412. A tip's reliability can be established in a number of different ways. A tip may describe suspicious details concerning conduct that is presently occurring or is about to occur in the future (i.e., a call received after midnight, on a warm summer evening, stating, "A person is carrying a gun; that person is wearing a ski mask and a long trench coat and is approaching a convenience store."). Verification by the police of the suspicious details clearly provides the police with the requisite reasonable suspicion to make a Terry stop.
The more difficult case involves those tips which allege criminal conduct, but only describe "innocent details of identification," for which the details in and of themselves are in no way incriminating or indicative of criminal behavior. Butts, 644 So.2d at 606 (quoting Robinson v. State, 556 So.2d 450, 452 (Fla. 1st DCA 1990)). Innocent detail tips merely provide the police with verifiable details *207 which are completely innocent in nature (i.e., a tip similar to the one in this case, which only describes innocuous clothing, location, etc.). Nevertheless, innocent detail tips can still prove to be reliable and be the foundation for reasonable suspicion. See United States v. Walker, 7 F.3d 26, 31 (2d Cir.1993). For instance, a tip can predict particular actions which will occur in the future. Future predictions can establish that the tip is reliable if the tip "contain[s] a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." White, 496 U.S. at 332, 110 S.Ct. 2412 (quoting Gates 462 U.S. at 245, 103 S.Ct. 2317). "[I]ndependent corroboration by the police of significant aspects of the informer's predictions [can] impart[] some degree of reliability to the other allegations made by the caller." Id. If the actions do occur as the informant predicted, and the actions involve matters to which a normal person would not be privy, this demonstrates that the informant has a "special familiarity with the [suspect's] affairs," beyond the knowledge that a normal person would possess. Id.
Reasonable suspicion can be established by verification of a presently-occurring innocent detail tip coupled with an independent police investigation. See generally United States v. Bold, 19 F.3d 99, 103 (2d Cir.1994). But for these types of tips (presently-occurring innocent detail tips), the independent police investigation would have to uncover something more than just a verification of the innocent details. The police must observe additional suspicious circumstances as a result of the independent investigation. See White, 496 U.S. at 329, 110 S.Ct. 2412 ("Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of the suspect would be authorized."). Judge Allen's opinion in Butts provides the correct framework for analysis:
An anonymous tip can provide the basis for an investigatory stop when the tip, as corroborated by independent police work, exhibits sufficient indicia of reliability to furnish police with a reasonable suspicion that the defendant is engaged in criminal activity. Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). The "totality of the circumstances" test is used to determine the requisite level of suspicion. Id. The reliability of an anonymous tipster's information is evaluated in part on its degree of specificity and in part on the independent corroboration of significant aspects of the informant's predictions. Swanson v. State, 591 So.2d 1114, 1116 (Fla. 1st DCA 1992).
644 So.2d at 606.
The State argues that the tip in the present case is reliable. We disagree. Initially, we must observe that the essential issue presented here would be the same whether the anonymous tip involved three white males in business suits waiting for a taxi, or three white females waiting for a ride to a certain location. The officers received an anonymous tip that a young man was carrying a concealed weapon. The tip disclosed that the young man was standing by a bus stop at a specific location and that he was wearing a plaid-looking shirt. The reliability of this tip was not proven by any of the previously described ways recognized as sufficient in our case law. The tip did not involve suspicious behavior which the police could have verified as suspicious upon arrival; rather the tip involved innocent details, none of which involved incriminating or criminal behavior.
Further, the innocent details provided in the tip did not involve future action for which the police could verify whether or not such future action would occur; rather the tip involved present action which could have been provided by "any pilgrim on the roadway." Butts, 644 So.2d at 606 (quoting Robinson, 556 So.2d at 452). Finally, the presently-occurring innocent detail tip was not corroborated through an independent investigation on the part of the police which established that the suspect was engaging in suspicious behavior; rather, "the officers' independent investigation added nothing to the reliability of the tip"the officers merely verified that the defendant was in fact standing by the bus stop and wearing a plaid shirt, neither of which is suspicious. Butts, *208 644 So.2d at 606. Based on this record, we are unable to conclude that this tip exhibited "sufficient `indicia of reliability'" to furnish the police with the necessary reasonable suspicion to make a Terry stop and frisk. White, 496 U.S. at 328, 110 S.Ct. 2412 (quoting Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).[2]
The officers in the present case merely arrived at the scene and confirmed that a male was wearing a plaid-looking shirt and standing by a bus stop. There is nothing suspicious about either of these details. Further, the officers did not observe anything suspicious about the suspect prior to performing the Terry stop. The officers' actions are also called into serious question by the fact that the officers frisked all three individuals standing near the bus stop, not just the individual wearing the plaid shirt. Under the totality of the circumstances, we are unable to conclude that the officers had reasonable suspicion to stop and detain the three people at the bus stop and conduct a frisk in this case. Of course, there was nothing to prevent the police from engaging in a consensual encounter with the trio or from questioning them concerning their possession of a weapon as reported in the anonymous tip. However, the officers' forcible actions in response to the anonymous tip were an active intervention into an otherwise peaceful situation and did not warrant a frisk until some observable suspicious conduct took place. Therefore, we agree with the trial court that the evidence recovered as a result of the impermissible stop and frisk should have been suppressed.
We are aware that other jurisdictions appear to recognize a "firearm exception"[3] to the reasonable suspicion test. See United States v. DeBerry, 76 F.3d 884 (7th Cir.1996) (holding that evidence is admissible based on mere verification of a presently-occurring innocent detail tip); United States v. Clipper, 973 F.2d 944 (D.C.Cir.1992) (same).[4] We *209 join the Supreme Court of Pennsylvania in rejecting this exception:
The Commonwealth takes the radical position that police have a duty to stop and frisk when they receive information from any source that a suspect has a gun. Since it is not illegal to carry a licensed gun in Pennsylvania, it is difficult to see where this shocking idea originates, notwithstanding the Commonwealth's fanciful and histrionic references to maniacs who may spray schoolyards with gunfire and assassins of public figures who may otherwise go undetected. Even if the Constitution of Pennsylvania would permit such invasive police activity as the Commonwealth proposes which it does notsuch activity seems more likely to endanger than to protect the public. Unnecessary police intervention, by definition, produces the possibility of conflict where none need exist.
Commonwealth v. Hawkins, 547 Pa. 652, 692 A.2d 1068, 1071 (Pa.1997). In Florida, it is generally not illegal to possess a firearm. See generally ch. 790, Fla. Stat. (1997). Additionally, Florida provides that individuals are permitted to carry concealed weapons with a proper license. See § 790.06, Fla. Stat. (1997). There are even certain situations (not involved here) where juveniles are permitted to possess firearms. See § 790.22, Fla. Stat. (1997).
For the reasons stated herein, we determine that there is no firearm or weapons exception to the Fourth Amendment and the bare-boned anonymous tip involved herein, by itself, did not provide the police with sufficient cause to stop and frisk.
We recognize that in State v. Webb, 398 So.2d 820 (Fla.1981), this Court held that the anonymous information contained in a police BOLO (be on the lookout) bore sufficient indicia of reliability, therefore justifying a stop and frisk. We find that Webb is distinguished from the present case. In Webb, the BOLO was pursuant to an investigation regarding alleged crimes that had already occurred on the previous two days. The suspect matching the BOLO was apprehended in the vicinity of the crime scene, providing further support that the person apprehended was in fact the perpetrator of the crimes. These two factors considered together provided the police with the necessary suspicion to make the stop. These circumstances are in contrast to the facts of the present case, where the police were not investigating a crime that had previously taken place.
In the present case, the Third District relied on this Court's previous decision in Hetland v. State, 387 So.2d 963 (Fla.1980). In Hetland, this Court held that an anonymous tip can provide the basis for a valid stop if the tip carries sufficient indicia of reliability. We reaffirm this holding in today's decision. However, we find that a mere detailed description of a person's clothing and location, by itself, is not enough to sufficiently establish a tip's indicia of reliability.
Accordingly, we quash the decision under review. We approve the opinion of the First District Court of Appeal in Butts.
It is so ordered.
SHAW, KOGAN and ANSTEAD, JJ., concur.
HARDING, C.J., concurs with an opinion, in which KOGAN and ANSTEAD, JJ., concur.
OVERTON, J., dissents with an opinion, in which WELLS, J., concurs.
WELLS, J., dissents with an opinion.
HARDING, C.J., concurring.
I concur with the majority. I write to emphasize that the solution to this country's firearm epidemic cannot come at the expense of the principles set forth in the federal Constitution. I am aware that our streets and school grounds[5] have become venues of *210 public violence, resulting in large part to the availability and accessibility of firearms. The United States Supreme Court recognized the need for public safety in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the case which created the stop and frisk doctrine.[6] While Terry did not deal with an anonymous tip relating to a firearm, it did address the balancing of safety and the constitutional protection provided by the Fourth Amendment. A review of Terry leads me to conclude that the Supreme Court would require more than a mere anonymous tip before a police intrusion would be authorized by the Fourth Amendment.
This point is exemplified by a careful analysis of the Supreme Court's language in Terry. The setting in Terry involved "on-the-spot observations of the officer on the beat." Id. at 20, 88 S.Ct. 1868. The Supreme Court clearly set out the test for determining when such limited intrusions may take place:
[I]t is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? Anything less would invite intrusion upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. And simple "`good faith on the part of the arresting officer is not enough.' ... If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be `secure in their persons, houses, papers and effects' only in the discretion of the police."
. . . .
... The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.
Id. at 21-22, 27, 88 S.Ct. 1868 (emphasis added) (citations omitted). Applying this language to the facts of the present case, it becomes obvious that the information provided in the anonymous tip in question was the equivalent of an "inchoate and unparticularized suspicion or hunch," which in and of itself is insufficient to justify police intrusion. Thus, if the language of Terry, and indeed the Fourth Amendment, is to have any meaning, the evidence in the present case must be suppressed. A contrary result would lead to the "evaporation" of the constitutional rights of the Fourth Amendment.
It seems that the main concern of the dissenting justices is the ease with which individuals are able to access weapons, a concern which is well founded. However, the right to bear arms is not the issue in the present case; rather, we are concerned with the right to be free from unreasonable searches and seizures. The effect of allowing a "firearms exception" would be the equivalent of saying that there are no unreasonable searches and seizures, and thus no Fourth Amendment rights, so long as the anonymous informant uses the magic word "firearm." To allow such an exception would threaten the basic protections of this nation's Constitution.[7]
KOGAN and ANSTEAD, JJ., concur.
*211 OVERTON, J., dissenting.
The possession without authority of a concealed firearm by any individual in a public place or at a public event is a prescription for disaster, but the possession of a concealed firearm by a child is an especially dangerous and explosive situation. In deciding not to allow the stop and frisk in this case, the majority fails to follow the clear controlling precedent of this Court, and in addition expresses a holding contrary to the view of the overwhelming majority of jurisdictions that have considered the issue. In my view, the majority also makes a poor public policy decision that is dictated neither by the law nor by common sense. The majority decision is not only bad policyI believe it threatens the physical safety of the law enforcement officers and citizens of this state. What must be remembered is that the Florida and United States constitutions protect against "unreasonable searches and seizures." Under the circumstances of this case, stopping and frisking this child and seizing the concealed weapon is not unreasonable.
The unfortunate reality of today's society is that dangerous persons of all ages stand armed and ready to shoot law enforcement officers and citizens. I am unable to ignore the daily headlines of our nation's newspapers and the statistics compiled by law enforcement agencies that reveal the great risk of harm posed by firearms in this country. According to the Uniform Crime Reports published by the Federal Bureau of Investigation, firearms claimed the lives of 92% of the 696 law enforcement officers killed in the line of duty from 1987 through 1996. Of those murders committed with firearms, 71% involved handgunsweapons that are easily concealed. Recent events have tragically demonstrated that children, such as the petitioner, and guns are an especially explosive mixture.[8] The violence involving firearms at our nation's schools is a problem of major significance.[9] Unfortunately, the majority has virtually ignored the great harm caused by firearms and has lost sight of the fact that the rationale of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), is to protect law enforcement officers and the general public from the dangers associated with armed suspects.[10] It has also lost sight of a common sense definition of the term "unreasonable." The majority has acknowledged that the United States Supreme Court, in formulating the "reasonable suspicion" test under Terry, balanced the privacy interests of citizens with the safety interests of police *212 officers and the public.[11] With respect to the circumstances presented in this case, Judge Posner of the Seventh Circuit Court of Appeals wrote that the balancing test involves "the right of the people to be let alone and their right to be protected from armed predators." United States v. DeBerry, 76 F.3d 884, 886 (7th Cir.1996). I believe that a proper balancing of the interests demonstrates that the government's obligation to protect citizens and law enforcement personnel from violent crime substantially outweighs an individual citizen's interest against the limited privacy intrusion of a Terry stop and frisk. This Court is not the first to address this issue. I would follow the strong majority view and hold that when the police receive an anonymous tip alleging that a person is carrying an illegally concealed weapon and only the innocent details of the tip are verifiable, the police may conduct an investigatory stop and frisk of the suspect. See, e.g., United States v. DeBerry, 76 F.3d 884 (7th Cir.1996); United States v. Clipper, 973 F.2d 944 (D.C.Cir.1992); United States v. McClinnhan, 660 F.2d 500 (D.C.Cir.1981); Speight v. United States, 671 A.2d 442 (D.C. 1996); United States v. Johnson, 540 A.2d 1090 (D.C.1988); United States v. Mason, 450 A.2d 464 (D.C.1982); State v. Webb, 398 So.2d 820 (Fla.1981); Hetland v. State, 387 So.2d 963 (Fla.1980); State v. Kuahuia, 62 Haw. 464, 616 P.2d 1374 (Haw.1980); People v. Smithers, 83 Ill.2d 430, 47 Ill.Dec. 322, 415 N.E.2d 327 (Ill.1980); Graham v. Commonwealth, 667 S.W.2d 697 (Ky.Ct.App.1983); State v. Jernigan, 377 So.2d 1222 (La.1979); State v. Hasenbank, 425 A.2d 1330 (Me. 1981); Johnson v. State, 50 Md.App. 584, 439 A.2d 607 (Md.Ct.Spec.App.1982); Commonwealth v. Stoute, 422 Mass. 782, 665 N.E.2d 93 (Mass.1996); Commonwealth v. McCauley, 11 Mass.App.Ct. 780, 419 N.E.2d 1072 (Mass.App.Ct.1981); State in re H.B., 75 N.J. 243, 381 A.2d 759 (N.J.1977); State v. Williams, 251 N.J.Super. 617, 598 A.2d 1258 (N.J.Super.Ct. Law Div.1991); People v. McLaurin, 43 N.Y.2d 902, 403 N.Y.S.2d 720, 374 N.E.2d 614 (N.Y.1978); State v. Pulley, 863 S.W.2d 29 (Tenn.1993); State v. Franklin, 41 Wash.App. 409, 704 P.2d 666 (Wash. Ct.App.1985). Apparently, the only case that supports the majority's decision is Commonwealth v. Hawkins, 547 Pa. 652, 692 A.2d 1068 (Pa.1997).
To more fully explain my position, it is necessary to restate part of the facts in this case. The police received an anonymous tip that one of three young black males standing at a bus stop in front of a pawnshop at a specific and public location was carrying a concealed firearm. The tipster described the appearance of each of the young males and said that the individual with the gun was wearing a "plaid-looking" shirt. Officer Carmen Anderson, a police officer with more than fourteen years of experience, and another officer arrived at the scene only six minutes after receiving the anonymous complaint. The officers immediately verified the accuracy of all of the appearance and location information provided by the tipster. J.L. was standing by the bus stop with two other young black males and he was wearing a plaid shirt. Officer Anderson approached J.L., asked him to put his hands above his head, and conducted a pat-down of his outer garments. Officer Anderson then seized a gun that she saw protruding from J.L.'s left pocket. J.L. was taken into custody and charged with unlawfully carrying a concealed firearm[12] and possession of a firearm by a minor under eighteen years of age.[13]
J.L.'s motion to suppress was granted by the trial court. The Third District Court of Appeal reversed, holding that the police had a reasonable suspicion that J.L. was carrying a concealed weapon. The district court stated that the investigatory stop and frisk was justified because the surrounding circumstances indicated to the officers that the *213 anonymous tip was reliable. The district court noted that all of the information provided in the anonymous tip, except that relating to the concealed firearm, was verified by the police officers immediately upon their arrival at the scene. As to the inability of the police to verify the existence of the concealed firearm prior to the frisk, the district court stated that
where a confirmed tip concerns an individual with a gun, the officer is faced with the choice of stopping and searching the individual, or waiting until the individual brandishes or uses the gun and the latter choice is unacceptable, thus leaving the stop and frisk as the only reasonable choice.
J.L., 689 So.2d at 1118.
In reaching its decision, the district court appropriately relied upon this Court's decision in Hetland v. State, 387 So.2d 963 (Fla. 1980), which expressly adopted the decision of the Second District Court of Appeal in State v. Hetland, 366 So.2d 831 (Fla. 2d DCA 1979). In Hetland, the sheriffs deputies received an anonymous tip that Hetland was on his way to a local tavern to shoot someone. The tipster gave Hetland's description to the police and informed them that he was carrying a silver revolver. The deputies immediately proceeded to the tavern and identified Hetland sitting at the bar. "There was no commotion; all was quiet. [Hetland] was... sitting at the bar and there was nothing in his manner or actions which was suspicious." Hetland, 366 So.2d at 833 (emphasis added). One of the deputies asked Hetland to stand up. When Hetland complied, the deputy saw a gun protruding from Hetland's waistband. The weapon was seized and Hetland was arrested for carrying an illegally concealed firearm. The trial court suppressed the revolver as evidence. On appeal, the Second District Court of Appeal reversed, holding that the tip was sufficiently reliable to justify the investigatory detention and seizure. On review, this Court summarily approved of the decision of the district court and expressly adopted its opinion.
One year following our decision in Hetland, this Court again considered the issue of the validity of a stop and frisk based on an anonymous tip that concerned a concealed weapon. In State v. Webb, 398 So.2d 820 (Fla.1981), a bulletin was issued for the police to "be on the lookout" (BOLO) for a white male with specific physical features who was suspected of having committed two armed robberies on the two previous days. The BOLO was based on apparently anonymous information. The BOLO also provided that the suspect was carrying a black gun. Six hours after the BOLO was issued, the police saw Webb walking down a street approximately two miles from the scene of the robberies. Because Webb matched the description given in the BOLO, the officers conducted a stop and frisk of Webb and recovered a concealed firearm. Webb was arrested for carrying the concealed firearm. Webb was not charged with the robberies that he had been suspected of committing, but was charged with carrying an illegally concealed weapon. The trial court denied Webb's motion to suppress. On appeal, the district court reversed. This Court quashed the district court's decision, holding that the apparently anonymous information in the BOLO was specific and corroborated such that it bore sufficient indicia of reliability. In conclusion, we wrote as follows:
Under the totality of the circumstances, we hold that the stopping and the frisking of Webb was valid and that the trial court correctly denied the motion to suppress.
To hold otherwise would place in jeopardy the lives of police officers who have made a valid stop and who have reason to believe that the suspect is armed. As Justice Harlan stated in his concurring opinion in Terry v. Ohio, "[t]here is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet." 392 U.S. at 33, 88 S.Ct. at 1886. Upon the information known to the officers, failure to have stopped Webb would "have been poor police work indeed," Terry v. Ohio, 392 U.S. at 23, 88 S.Ct. at 1881, and failure to frisk could have cost the officers their lives.
Webb, 398 So.2d at 826.
Hetland and Webb clearly control the issue presented in this case and demand the same *214 result. This Court in Hetland upheld the stop and frisk on material facts that are virtually identical to the facts of the present case, and this Court in Webb upheld the stop and frisk on facts that are notably weaker than the facts of the present case. The attempts of the majority to distinguish Hetland and Webb from the present case are wholly unpersuasive, and I fear that the majority opinion will confuse the law enforcement officers and trial judges who must confront the circumstances presented in this case on a daily basis. If the present majority of this Court is dissatisfied with the decisions of prior majorities of this Court, then it should say so, and recede from Hetland and Webb. I, of course, maintain that Hetland and Webb reached proper conclusions.
The law is clear that a police officer may make an investigatory stop of a citizen if the officer has a reasonable suspicion that the individual is committing or is about to commit a crime. Terry. The "totality of the circumstances" test is used to determine whether the investigatory stop was supported by the requisite reasonable suspicion. Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). If the officer has a reasonable suspicion that the detained individual is armed and dangerous to the officer or others, a limited frisk for weapons may be conducted. Terry; Minnesota v. Dickerson, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). The United States Supreme Court has deemed such a stop and frisk to be a "limited intrusion." Adams v. Williams, 407 U.S. 143, 148, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)(emphasis added). Under appropriate circumstances, an anonymous tip may carry sufficient indicia of reliability to justify an investigatory stop and frisk. White, 496 U.S. at 328, 110 S.Ct. 2412. The reliability of the anonymous tip is based in part on the specificity of the information provided and the ability of police officers to quickly and independently corroborate significant aspects of the information. White, 496 U.S. at 331-32, 110 S.Ct. 2412. The corroboration of only the innocent details of an anonymous tip concerning certain illegal activities, such as the sale or possession of drugs, is insufficient to provide police officers with a reasonable suspicion of criminal activity. See Robinson v. State, 556 So.2d 450 (Fla. 1st DCA 1990). However, as stated by Professor LaFave:
It must be recognized that stoppings for investigation are not all of one kind and that in some instances the need for immediate action may be so great that substantial doubts about the reliability of the informant or his information cannot be permitted to stand in the way of prompt police action.
4 Wayne R. LaFave, Search and Seizure § 9.4(h), at 229 (3d ed.1996).
An anonymous tip concerning an individual with an illegally concealed firearm presents a unique situation. When confronted with this situation, police officers may not be able to verify more than the innocent details of the tip without substantially risking their safety or the safety of the general public. As stated by the Second Circuit Court of Appeals:
"The unique dangers presented to law officers and law-abiding citizens by firearms are well chronicled." [United States v. Clipper, 973 F.2d 944, 949-51 (D.C.Cir. 1992)]. An officer who is able to corroborate other information in an anonymous tip that another person is in actual possession of a gun is faced with an "unappealing choice." United States v. McClinnhan, 660 F.2d 500, 502 (D.C.Cir.1981). He must either stop and search the individual, or wait until the individual brandishes or uses the gun. Id. at 502-503.
United States v. Bold, 19 F.3d at 104. I fully agree. To say that the officers in this case should have waited until this child did something more to arouse their suspicion is unreasonable. I fear that the "additional suspicious circumstances" required by the majority before the police may act will too often turn out to be the suspect's actual use of the unseen firearm. In light of the recent homicides committed by children, I suspect that the public's reaction to the majority's decision will be, "Where is your common sense?"
I would do what the majority of jurisdictions have done and recognize a "firearm exception" to the general rule that the corroboration of only the innocent details of an *215 anonymous tip does not provide police officers with a reasonable suspicion of criminal activity. In my view, this holding is necessary because the great risk of harm to the public and police in such a situation substantially outweighs the limited privacy intrusion to the suspect. Such a holding is true to the dictates of Terry. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27, 88 S.Ct. 1868 (emphasis added). Clearly, it is reasonable in today's society for law enforcement officers confronted with the circumstances presented in this case to conduct a stop and frisk.
I strongly emphasize that this holding should apply only to investigatory stop and frisks supported by reliable anonymous tips regarding individuals possessing illegally concealed firearms. As explained by the United States Court of Appeals, District of Columbia Circuit, the distinction between an anonymous tip involving a firearm and a tip involving possession of other contraband, such as illegal drugs, is significant:
Th[e] element of imminent danger distinguishes a gun tip from one involving possession of drugs. If there is any doubt about the reliability of an anonymous tip in the latter case, the police can limit their response to surveillance or engage in "controlled buys." Where guns are involved, however, there is the risk that an attempt to "wait out" the suspect might have fatal consequences.
United States v. Clipper, 973 F.2d at 951.
The anonymous tip in this case specifically described the appearance and location of a juvenile carrying a concealed firearm. The location was along a street where other members of the public were present. This fact raised the stakes for the officers because they had to worry about not only their own safety but also the safety of others nearby. The police officers, at least one of whom had substantial law enforcement experience, responded to the tip in a matter of minutes. The timing of their arrival ensured that the reported information was still fresh, thereby increasing the possibility that the officers would confront the suspect before any violence could occur and reducing the possibility that the officers would detain the wrong person. Upon arriving at the scene, the officers immediately verified all of the appearance and location information provided by the tipster. The only information the officers were unable to verify was J.L.'s actual possession of a concealed weapon. Officer Anderson conducted an investigatory stop and frisk of J.L. and seized a gun. This limited privacy intrusion was clearly reasonable and necessary for the protection of the officers and nearby members of the public. I would find that, under the totality of the circumstances, this anonymous tip concerning the illegal possession of a concealed firearm, corroborated by independent police work, justified the stop and frisk of J.L. Consequently, the seizure of the gun from J.L. would be valid. While the majority states that there is potential for abuse in recognizing a "firearms exception," I believe the potential for such abuse is minimal when compared to the harm that concealed firearms may cause to law enforcement and the general public. Accordingly, consistent with our decision in Hetland and Webb, and the decisions of the majority of jurisdictions that have considered the issue, I would approve the decision of the Third District Court of Appeal in this case and disapprove Butts v. State, 644 So.2d 605 (Fla. 1st DCA 1994).
WELLS, J., concurs.
WELLS, J., dissenting.
I join in the thorough and well-reasoned dissent of Justice Overton.
I write separately only to point out, contrary to the assertion of the concurring opinion, that my decision is not based upon a confusion between the right to bear arms and the right to be free from unreasonable searches and seizures. Rather, I conclude that to guard the constitutionally protected right to be free from unreasonable searches and seizures, this Court is not required to ignore the reality of what is happening daily in our country, our state, and in every local community of Florida.
*216 The protection under scrutiny is against what is unreasonable. What is unreasonable has to be measured against what are the contemporary facts of life. I fault the majority because, in my judgment, it chooses to eliminate the word "unreasonable" from the Fourth Amendment. The majority's decision unnecessarily exposes many innocent residents of this state to severe harm from the violence of guns and without justification hinders law enforcement officers in their work to protect innocent residents. This simply does not have to be done to guard the Fourth Amendment.
NOTES
[1] The procedure employed by the police in this case is not permissible under the current law. It would only be permissible if this Court were to recognize an exception to the current law.
[2] The district court in J.L. cited to Bold to support its holding. However, Bold is distinguished from the present case. In Bold, the police received a tip that a twenty-one year old black male was carrying a gun. The informant alleged that the suspect was in a four-door gray Cadillac parked outside of a particular White Castle restaurant. The police verified the details of the tip and conducted an independent investigation, which revealed additional suspicious details that were separate and distinct from the details provided by the tip. When the police arrived, they noticed that the car was located in a remote part of the parking lot. One of the officers testified that the location of the car "raised [his] suspicion that [the people in the car] might be having something to hide." Bold, 19 F.3d at 103. Further, the officers were unable to look into the car to further verify the tip because the windows of the car were darkly tinted. Another officer testified that the window tinting "aroused [his] caution level." Id. at 100-01. The Second Circuit Court of Appeals concluded that "the anonymous tip in this case did not itself provide information from which to conclude that the caller was honest or his information reliable." Id. at 103. Thus, the police did not obtain the necessary reasonable suspicion to justify the Terry stop until the officers personally perceived the suspicious circumstances as a result of their own independent investigation. The actions of the police officers in the present case cannot be considered the equivalent of the independent investigation that took place in Bold.
[3] Often, carving out exceptions to constitutional principles can lead one to the top of a "slippery slope." In Terry, the United States Supreme Court recognized a limited exception to the probable cause requirement. The Supreme Court reasoned:

[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has a reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.
Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (emphasis added).
Those jurisdiction recognizing a "firearm exception" are in essence carving out an exception to an exception, by requiring less than reasonable suspicion for a Terry stop in response to an anonymous tip which alleges that an individual is carrying a firearm. We are unwilling to carve out this new exception from the original exception recognized in Terry.
[4] Allowing a "firearm exception" opens the door for potential abuse. For instance, what if a firearm tip proved to be unreliable, and instead of finding a weapon, the police officers discover illegal drugs? We have concerns that this scenario might subject a person to prosecution for possession of illegal drugs. See United States v. Clipper, 973 F.2d 944 (D.C.Cir.1992) (holding that drug evidence obtained as a result of the "firearm exception" stop and frisk was admissible, despite the fact that the tip was incorrect in the assertion that the suspect was carrying a gun). It will be difficult to determine where the line should be drawn if such an exception is permitted.
[5] The result of the present case might have been different had the frisk been conducted by a school official on school grounds. See Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 656, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) ("Fourth Amendment rights ... are different in public schools than elsewhere...."); New Jersey v. T.L.O., 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) ("[T]he legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search.").
[6] In Terry, the Supreme Court held that a police officer is permitted to stop an individual in circumstances where the officer possesses reasonable suspicion that the individual is engaged in criminal activity. 392 U.S. at 19-23, 88 S.Ct. 1868. An officer is also permitted to conduct a limited frisk of the individual if the officer possesses reasonable suspicion that the individual is armed and poses a threat to the officer or others. Id.
[7] In his dissent, Justice Overton refers to the frisk as a "minimal privacy intrusion." To the contrary, as noted by the United States Supreme Court in Terry:

[I]t is simply fantastic to urge that [a frisk] performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with hands raised, is a "petty indignity." It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and is not to be undertaken lightly.
Terry, 392 U.S. at 16-17, 88 S.Ct. 1868 (footnote omitted).
Justice Overton also focuses on the fact the defendant in the present case is a juvenile. It is important to point out that the "firearm exception" would apply to all citizens, not just juveniles.
[8] Violent crime committed by juveniles continues to rise. FBI statistics presented to the United States House of Representatives show that the number of juveniles charged with murder increased 104 % from 1970 through 1992. 144 Cong. Rec. H226-27 (daily ed. Feb 3, 1998) (statement of Mr. Kingston). The number of juveniles arrested on weapons offenses has more than doubled over the past ten years. From 1965 through 1992, the number of twelve-year-olds arrested for violent crime rose 211 %; the number of thirteen and fourteen-year-olds arrested for such crime rose 301 %; and the number of fifteen-year-olds arrested for such crime rose 297 %. 143 Cong. Rec. H2,313-14 (daily ed. May 7, 1997) (statement of Mr. Solomon).
[9] Over the past two years, children as young as eleven years of age have shot classmates, teachers, and school administrators in cities such as Jonesboro, Arkansas; Bethel, Alaska; Olivehurst, California; Grayson, Kentucky; West Paducah, Kentucky; Pearl, Mississippi; Springfield, Oregon; Edinboro, Pennsylvania; Fayetteville, Tennessee; and Moses Lake, Washington. Undoubtedly, by the time this opinion is published, the list of cities where schoolyard homicides have occurred will have grown.
[10] In Terry, the Supreme Court wrote as follows:

[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.
Terry, 392 U.S. at 24, 88 S.Ct. 1868.
[11] The Supreme Court wrote as follows:

Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.
Terry, 392 U.S. at 27, 88 S.Ct. 1868.
[12] § 790.01(2), Fla. Stat. (1995).
[13] § 790.22(3), Fla. Stat. (1995).